ALLSTATE TEXAS LLOYDS V. C. ROBERT MASON AND DEBORAH MASON

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-02-321-CV

ALLSTATE TEXAS LLOYDS APPELLANT

V.

C. ROBERT MASON AND DEBORAH MASON APPELLEE

------------

FROM THE 211
TH
 DISTRICT COURT OF DENTON COUNTY

------------

OPINION

------------

I.  Introduction

This suit involves a dispute over whether foundation damage to appellees C. Robert Mason and Deborah Mason’s house is covered under appellant Allstate Texas Lloyds’s homeowners insurance policy.  The policy excludes coverage for loss caused by “settling, cracking, bulging, shrinkage, or expansion of foundations, walls, floors, ceilings.”  Excepted from this exclusion is loss caused by “Accidental Discharge, Leakage or Overflow of Water or Steam from within a plumbing, heating or air conditioning system or household appliance.”  At issue is whether foundation and other related damages to the Masons’ house were caused by a plumbing leak.  Allstate denied coverage, and the Masons sued for breach of contract, the breach of the duty of good faith and fair dealing, unconscionable conduct, and unfair or deceptive acts or practices under the Texas Deceptive Trade Practices Act and the Texas Insurance Code.  Following a jury trial, the trial court rendered judgment on the jury verdict, awarding the Masons $163,159.76 in actual damages, $88,561.97 in statutory damages, $74,600 in attorney’s fees, $49,216.02 costs in pre- and post-judgment interest and costs, and $3.5 million in exemplary damages.

In six issues on appeal, Allstate challenges the award of exemplary damages, the admission of the Masons’ expert testimony into evidence, the admission of testimony into evidence regarding Allstate’s opposition to a pretrial appraisal of the damages to the house, and the legal and factual sufficiency of the evidence to support the judgment.  We affirm in part and reverse and render in part.

II.  Factual Background

The Masons’ house is located at 1108 Dentonshire in Carrollton, Texas.  It was built in the late 1980s along with two neighboring houses by the same builder.  Shortly after the three houses were built, each house suffered foundation settlement with their low points at the southeast corners and their high points at the northwest corners.  The owners of the other two houses sued the builder because the foundation damages were so severe.  The owners of the house at 1108 Dentonshire did not join the suit.

The house at 1108 Dentonshire was built on a sloping embankment with the back of the house cut into the hill and the rest of the house founded on “fill.”  Apparently the builder did not compact the soil, and the foundation settled and took the shape of the terrain’s slope before construction began.  As a result, the house’s southeast corner rested about five to seven inches below other parts of the house.  The settlement caused cracks in the house’s exterior and interior walls, including a large crack in the west exterior wall. 

Before placing the house on the market, the owners’ realtor retained Greg Wilson, an engineer, to inspect the house in January 1992.  On the exterior of the house, Wilson saw tension breaks in the west wall brick, a vertical crack in the west wall mortar, a crack in the mortar over the front window, a separation at the roof gable, a separation between the brick and the west garage door frame, and heaving of the back patio and pool decking.  Inside the house, Wilson saw heaving of the east patio door threshold, a tension crack over the east living room window, sheetrock damage in the living room ceiling, misalignment of the front entrance door and a patio door, separation at the northwest corner in the dining room, tension cracks over the master bedroom windows, sheetrock damage to the breakfast room ceiling, and a separation between the wall and ceiling over the stairs.  Wilson concluded that subsurface water beneath the foundation caused the foundation upheaval and particularly the upheaval in the house’s north section.
(footnote: 1)  

Following his inspection, Wilson recommended that a French drain be installed to address the problem of underground water damaging the foundation.  After the French drain was installed, Wilson visited the house again in September 1992 and saw that the drain appeared to be working, the foundation appeared stable, and the interior cracks had been repaired.  The exterior damages, including the crack in the west wall, however, had not been repaired.  No repairs were made to the foundation either.

In 1992, the Masons purchased the house and insured it with Allstate.  Although Robert Mason knew that the seller made some repairs to the home, such as cosmetic repairs of hairline fractures and the installation of a French drain, Mason claimed that the house was in “excellent condition” when they purchased it.  According to the Masons, the house remained in “pretty much perfect condition” until 1998 when cracks in the walls and ceilings began to appear.  

In 1998, misalignment of doors and cracks in the bricks and sheetrock began to appear, caused by heaving in the foundation.  The damages appeared to be similar to those sustained by the house after it was first built.  For instance, new cracks reopened in the entry hall and the den ceiling in the same places where cracks had been previously repaired.  
There were large cracks in the pool deck and a large separation in the patio, as well as a crack in the exterior west wall.  The house also continued to noticeably slope from its northwest corner to its southeast corner.

The Masons hired Hargrave Construction Company to repair the damage to their house, which hired Vannier Engineering Company to inspect the house and make recommendations for repairing the foundation.  In August 1998, Vannier inspected the house, and Hargrave recommended that a plumber check for plumbing leaks.  The Masons then made a claim under their Allstate policy after receiving a foundation repair estimate from Hargrave.

On December 29, 1998, Allstate assigned the claim to Glenn West, an adjuster who specializes in foundation claims.  West contacted the Masons and sent a reservation of rights letter to them on January 12, 1999.  The letter explained that the policy covered the cost of assessing the plumbing leak and any physical loss caused by it and did not cover the cost of repairing the plumbing leak and any damage caused by settling or expansion of the foundation or earth movement.  

During the investigation, the Masons used Allstate’s plumbing company, MCR Services, to check for plumbing leaks and make any necessary repairs. MCR located and repaired the plumbing leaks, including a leak underneath the west hall bathroom.  Allstate paid MCR for the cost of accessing the plumbing leaks but not for the cost of fixing the broken pipes.  

Allstate also retained Owen Tolson, an engineer, to inspect the house and determine whether the damage to the house was caused by a leak.  Tolson inspected the house on January 12 and 27, 1999.  During these inspections, Tolson learned about the history of the house, examined the failed pipe and plumbing diagnostics, and obtained soil data.  During his investigation, Tolson also reviewed Wilson’s 1992 report discussing the house’s subsurface drainage and foundation problems.

Based on his investigation, Tolson concluded that subsurface drainage caused the clay soil under the house to swell, leading to the foundation upheaval, and that the subsurface drainage combined with the soil expansion was alone sufficient to damage the house.  The swelling of the clay soil and resulting foundation movement in turn damaged the house and broke the pipe in two.  Tolson based his conclusion on the fracture of the pipe and the fact that the grade elevation for the west hall bathroom was lower and many feet away from the foundation’s high point.  Tolson concluded that the plumbing leak in the west hall bathroom did not cause the damage to the house.
(footnote: 2)
 West reviewed Tolson’s report and the plumbing information and determined that Allstate did not owe on the claim.  On February 25, 1999, West wrote to the Masons to inform them that Allstate was denying their claim based on the lack of evidence that plumbing caused the damage.  

The Masons filed suit against Allstate for breach of contract and the duty of good faith and fair dealing.  The Masons requested a court order compelling Allstate to participate in an appraisal of damages to the house, even though no liability had yet been established.  Over Allstate’s objection, the trial court ordered an appraisal.  The appraisers found that the repair costs to the house amounted to $142,159.76 and that $21,000 in living expenses would also be needed.  

After hearing the evidence, the jury found that Allstate breached the insurance policy and its duty of good faith and fair dealing; the jury found that it breached the latter with malice.  The jury also found that Allstate knowingly engaged in unconscionable conduct and knowingly committed an unfair or deceptive act or practice, violating the Texas Insurance Code and Texas Deceptive Trade Practices Act (DTPA).  The jury awarded the Masons $142,159.76 in repair costs and $21,000 in living expenses for the breach of contract claim.  The jury also awarded the same amounts for the breach of the duty of good faith and fair dealing and the violations of the insurance code and DTPA.  Finally, the jury awarded $3.5 million in exemplary damages. 

The Masons moved for judgment on the verdict, and Allstate moved for judgment notwithstanding the verdict.  The trial court entered a final judgment in favor of the Masons, awarding them $163,159.76 in actual damages for breach of contract, $88,561.97 for the violation of article 21.55 of the insurance code, and $3.5 million in exemplary damages.  The trial court also found that the Masons were entitled to recover on the jury’s findings of unconscionable conduct and breach of the duty of good faith and fair dealing, “whichever remedy permits the greater recovery”; the judgment did not specify, however, how much the Masons were entitled to recover for those claims.  The Masons elected to recover under “the DTPA ‘Unconscionable Action’ Cause of Action and the Good Faith and Fair Dealing Cause of Action and 21.55 of the Texas Insurance Code, in addition to the recovery under the Breach of Contract Cause of Action.”  The trial court further found that should those findings be reversed on appeal, the Masons would be entitled to recover $489,479.28
 for “knowing” violations of the DTPA and article 21.21 of the insurance code. Finally, the trial court awarded the Masons $74,600 in attorney’s fees, which Allstate does not challenge on appeal.

III.  Expert Testimony
    

In Allstate’s fifth issue, it argues the trial court erred in admitting into evidence Jim Linehan’s testimony.  Linehan, the Masons’ engineering expert,  opined that all the damages to the Masons’ house were the result of a plumbing leak under the west hall bathroom.  Allstate contends that this expert testimony was unreliable because Linehan did not rule out other plausible causes of the damage to the house and exclude those causes with reasonable certainty.  Specifically, Allstate focuses on Linehan’s failure to determine the cause of the plumbing leak under the house and to adequately address whether the house’s pre-existing foundation problems were the true cause of the damage. 

Whether the trial court properly admitted expert testimony is subject to an abuse of discretion standard of review.  
Helena Chem. Co. v. Wilkins
, 47 S.W.3d 486, 499 (Tex. 2001); 
E.I. du Pont de Nemours & Co. v. Robinson
, 923 S.W.2d 549, 558 (Tex. 1995)
.
  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.  
See Carpenter v. Cimarron Hydrocarbons Corp.,
 98 S.W.3d 682, 687 (Tex. 2002); 
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Downer
, 701 S.W.2d at 241-42.

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.  
Davis v. Huey
, 571 S.W.2d 859, 862 (Tex. 1978);
 see also Goode v. Shoukfeh,
 943 S.W.2d 441, 446 (Tex. 1997).  Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court’s decision.  
Butnaru v. Ford Motor Co., 
84 S.W.3d 198, 211 (Tex. 2002); 
Holley v. Holley
, 864 S.W.2d 703, 706 (Tex. App.—Houston [1
st
 Dist.] 1993, writ denied).

A two-part test governs whether expert testimony is admissible:  (1) the expert must be qualified;  and (2) the testimony must be relevant and based on a reliable foundation.  
Helena Chem. Co.
, 47 S.W.3d at 499.  A trial court has the threshold responsibility of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the issues of the case.  
See Gammill v. Jack Williams Chevrolet
, 
Inc
., 972 S.W.2d 713, 728 (Tex. 1998).  In meeting that responsibility, a trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach those conclusions is reliable.  
See id
.

To guide trial courts in assessing reliability, the supreme court has crafted two tests: the 
Robinson
-factor analysis and the “analytical gap” test.  
Gammill
, 972 S.W.2d at 727 (analytical gap test); 
Robinson
, 923 S.W.2d at 556.  Further, the supreme court has determined that expert testimony is unreliable if it fails to rule out other plausible causes.  
Merrell Dow Pharm., Inc. v. Havner
, 953 S.W.2d 706, 720 (Tex. 1997), 
cert. denied
, 523 U.S. 1119 (1998); 
Robinson
, 923 S.W.2d at 559; 
accord Martinez v. City of San Antonio
, 40 S.W.3d 587, 595 (Tex. App.—San Antonio 2001, pet. denied); 
Weiss v. Mech. Associated Servs.
, 
Inc.
 989 S.W.2d 120, 126 (Tex. App.—San Antonio 1999, pet. denied).  Accordingly, a trial court properly excludes expert testimony as unreliable if: (1) the foundational data underlying the opinion is unreliable; (2) the methodology used by the expert to interpret the underlying data is flawed; (3) notwithstanding the validity of the underlying data and methodology, there is an analytical gap in the expert evidence; or (4)  the expert fails to rule out other plausible causes.  
See
 Kimberly S. Keller, 
Bridging the Analytical Gap:  The Gammill Alternative to Overcoming Robinson & Havner Challenges to Expert Testimony
, 33 
St. Mary’s 
L.J. 277, 302-20 (2002).

During the 
Daubert
 hearing, Allstate asked Linehan whether he knew what caused the pipes under the bathroom to break.  Although he conceded that pipes could break due to soil movement (as well as other reasons), he stated that he did not investigate why the pipes broke in this case.  When asked if soil movement strong enough to break pipes under the house would also be strong enough to damage the foundation, Linehan again replied that he did not investigate why the pipes under the bathroom broke.  

Based on this testimony, Allstate essentially seems to be arguing that Linehan’s failure to determine what caused the pipes to break rendered his opinion that leaks caused the damage to the house unreliable because he did not exclude with reasonable certainty the possibility that the foundation damage occurred first as a result of soil movement caused by subsurface drainage and that the soil movement then caused the PVC pipe to break.  Several problems exist with this argument.  

First, Linehan had previously testified that he excluded the possibility that the problems that caused the foundation damage in 1992, which included soil movement resulting from subsurface drainage, were the cause of the damage in 1998.
(footnote: 3)  Linehan also testified that he did not believe that seasonal moisture, which could cause soil movement, caused the 1998 foundation damage.
(footnote: 4)  Incidentally, Allstate never specifically asked Linehan whether he excluded the possibility that subsurface drainage caused the soil under the house to move, which Allstate claimed at trial was the cause of the house’s 1998 foundation problems.  But the evidence shows that he discounted the possibility.

Moreover, Allstate’s questions to Linehan were based on hypothetical situations not shown to the trial court, in the record before us, to be actual plausible causes of the foundation damage that Linehan should have excluded in order for his opinion to be reliable.  For example, there was no evidence presented during the hearing to show that soil movement was a plausible cause of the foundation problems or that the hypothetical soil movement was strong enough to break either PVC pipe or a concrete foundation.  Moreover, because PVC pipe is not as strong as concrete, it is entirely possible that the foundation could have withstood a force that the pipe could not.  Without evidence to support the implications of Allstate’s hypothetical, we cannot say that the trial court abused its discretion in not excluding the expert testimony because Allstate came up with a hypothetical theory at the hearing that even Allstate did not show was possible or provable until after trial began.  Although Allstate’s attorney told the trial court that it had photographs and expert testimony to support its conclusion, it did not offer to admit the evidence at the hearing and that evidence was not introduced until after trial began. 

Based on the evidence presented at the 
Daubert
 hearing, we hold the trial court did not abuse its discretion in denying Allstate’s motion to strike Linehan’s testimony.  We overrule Allstate’s fifth issue with regard to the trial court’s ruling on the admissibility of Linehan’s testimony.

IV.  Legal and Factual Sufficiency of the Evidence

In Allstate’s sixth issue, it challenges the legal and factual sufficiency of the evidence to support the jury’s findings of a breach of contract, breach of the duty of good faith and fair dealing, malice, unconscionable conduct, and knowing violations of the DTPA and insurance code.  We will address each finding separately.

A.  Standards of Review

In determining a “no-evidence” or legal sufficiency issue, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary.  
Bradford v. Vento, 
48 S.W.3d 749, 754 (Tex. 2001)
; Cont’l Coffee Prods. Co. v. Cazarez, 
937 S.W.2d 444, 450 (Tex. 1996);
 In re King's Estate
, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).  Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cazarez,
 937 S.W.2d at 450;
 Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).

A “no-evidence” issue may only be sustained when the record discloses one of the following:  (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez,
 977 S.W.2d 328, 334 (Tex. 1998) (citing Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)),
 cert. denied
, 526 U.S. 1040 (1999).

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination.  
Mar. Overseas Corp. v. Ellis,
 971 S.W.2d 402, 406-07 (Tex.)
, cert. denied, 
525 U.S. 1017 (1998).

B.  Breach of Contract
  

Allstate contends that there is no evidence or insufficient evidence to show that the plumbing leak under the west hall bathroom caused the foundation damage to the house; thus, there is no evidence or insufficient evidence to show that Allstate breached the insurance policy by denying the Masons’ claim.  Although we have concluded that the trial court did not abuse its discretion in admitting Linehan’s testimony into evidence, this does not necessarily mean that Linehan’s testimony at trial amounts to legally sufficient evidence that a plumbing leak caused the foundation damage to the house.  In conducting a legal sufficiency review, we must also review the relevance and reliability of an expert’s testimony in light of all the evidence admitted at trial.  
See Havner
, 953 S.W.2d at 713, 720;
 State Farm Lloyds v. Mireles
, 63 S.W.3d 491, 493 (Tex. App.—San Antonio 2001, no pet.) (“The question of the admissibility of expert testimony goes hand in hand with this court's analysis under a legal sufficiency challenge.”).  There is no question that Linehan’s testimony was relevant to the issues at trial.

At trial, Linehan testified that the plumbing leaks under the house at the west hall bathroom caused 100% of the damage to the house.  He negated the possibility of other causes, including soil movement, being responsible for the foundation damage because, according to Linehan, the damage in 1998 occurred suddenly, which is not typical for foundation damage caused by soil movement, and there was no evidence of soil movement from 1992 through 1998.  

Linehan testified at trial:  

Q.  Okay.  Have you--have you checked with Mr. Mason to determine if the French drain has continued to work? 

A.  Mr. Mason has told me that every time it rains, the water keeps pouring out the French drain wonderfully.  He has noticed no time at which it has plugged up or anything else.  So a lot of work was done in 1992 prior to Mr. Mason buying the house and when they went in the house and repaired the sheetrock cracks, fixed the house up.  

Mr. Mason came to the house--and his wife bought the house.  And he told me, he says, if the house was a mess in 1992, he wouldn't have bought the house.  It was fine in 1992.  Did it have prior problems?  Yes, it did.  Were they corrected?  Yes, they were.  And then Mason comes by and buys himself a nice house in 1992. 

Q.  What is the next thing that historically is important to you in--regarding this house?

A.  Well, the next thing that was important to me was how about 1993, Mr. Mason?  Was the house fine then?  Yes, it was.  How about 1994?  Yes, it was.  Well in 1995?  Yes, it was.  '96?  Yes.  '97?  The house is fine.  What about 1998?  Oh, things started happening in 1998.  But the important thing to me is to not only write down 1998 but to tell me that he had six years in there the house wasn't moving substantially to cause any damage.  

And he tells me--and I have it--

Q.  Let me interrupt.  If the drainage or the trees or the settlement or anything was wrong with this house, what would it have been doing during those six years?

A.  It would have--it would--it would have continued to show movement, and sheetrock cracking would have got progressively worse between '92 and '98.

Q.  And that didn't happen?

A.  That didn't happen.

Q.  Okay.  What happened in '98?

A.  The house began to tear itself apart.  And we have some good photographs of that.  

. . . .

Q.  Okay.  What does it tell you then when you have this extensive damage around the location of the leak?

A.  Well, we had the foundation uplift at the leak.  We knew we had expansive clay soils.  We knew we had a plumbing leak right here (Indicating).  We had major damage all around here that suddenly began to occur over a short period of time.  And once the leaks got fixed, it hasn’t occurred again.

We also know at the rest of the house there is no damage.  So why did the damage occur here and not over here?  Because the leaks affected the foundation here, but they did not affect the foundation over here (Indicating).

Q.  On this area of the house where it is heaved up, how close is the French drain to that area?

A.  It is several feet away.

Q.  So the French drain would have prevented any--any--any rainwater from causing this heave?

A.  That’s right. 

. . . .

Q.  Assume that the pipe broke because of the movement of the soil.  If the soil is moving enough to break that pipe, it is going to be moving enough to damage that foundation, isn’t it?

A.  Not necessarily, because pipe is not as strong as what the concrete is.  So it--it could have broke the pipe first, released water underneath the house and really got the soils swelled that then uplifted and broke the foundation, and that--that could have also hypothetically happened that way. 

Linehan also relied on Wilson’s 1992 report, which concluded that after the French drain was installed, the problem of subsurface drainage had been eliminated.  While Linehan did not himself investigate whether the French drain was working properly in 1998, Mr. Mason informed him that it was working.  Finally, Linehan testified that unlike the foundation damage to the house in 1992 that covered several parts of the house, the damage in 1998 was limited to areas near the leak and that after the leak was repaired, the foundation stabilized.  Thus, according to Linehan, the 1998 damage was caused by the leak and not by the same factors that caused the damage in 1992.

Although at trial Linehan again testified that he did not investigate why the pipes broke, he stated that while soil movement might be enough to break the pipes it would not necessarily be enough to damage the foundation.  Because PVC pipe is not as strong as concrete, the pressure from soil movement might not have been strong enough to damage the foundation, but could have broken the pipe, which in turn could have increased the swelling in the soil causing it to uplift further and then damage the foundation.  Thus, according to Linehan, it was possible that the pipe broke and caused a leak and only as a result of the leak did the soil swell enough to cause the uplift.  

Based on the above evidence, we conclude that Linehan’s testimony was reliable because it sufficiently dispelled other possible causes of the 1998 foundation damage.  Accordingly, we also hold that Linehan’s testimony amounted to legally sufficient evidence for the jury to conclude that the pipe leak caused the foundation damage, which in turn supported the jury’s finding that Allstate breached the insurance policy by denying the Masons’ claim.

With regard to the factual sufficiency of the evidence, the jury was faced with two competing theories supported by expert testimony as to what caused the foundation damage.  Allstate’s theory was that soil movement caused the foundation damage, and the Masons’ theory was that the plumbing leak under the west hall bathroom did.  
As previously discussed, in support of the theory that the plumbing leak under the west hall bathroom caused the foundation damage, the jury heard Linehan’s testimony.  

To support the theory that soil movement caused the damage, Allstate introduced the testimony of three witnesses.  First, 
Owen Tolson testified that in his professional opinion, subsurface water from seasonal moisture made its way under the house and caused the uplift in the foundation
.
  
Tolson based this opinion on the history of the house, an examination of the French drain, the elevations in the foundation, and an examination of the nature of the break of the pipes that were removed from under the house.
  
Tolson testified that the pipe leaks did not cause the foundation damage and that the only explanation for the leak in the PVC pipe was that it snapped due to soil movement caused by subsurface drainage moving underneath the house.
  
According to Tolson, the nature of the fracture in the pipe indicated that the pipe broke after the foundation.  

Gregory Wilson testified about his inspection of the damage to the house in 1992 and that his recommendation was to eliminate the drainage problem by installing a French drain.  Wilson testified that he reinspected the house later in 1992 after the French drain had been installed to see if it was working properly.  He noted that the damages to the interior had been repaired but that the exterior damages had not; the foundation, however, appeared stable. Further, Wilson testified that French drains need to be checked every five years for maintenance and to make sure they are not clogged.  If they get clogged, they will not function properly.  
Finally, Wilson testified that while French drains will usually fix subsurface drainage problems, sometimes the drains do not solve the problem.  

Tim Slider, an Allstate engineering expert, testified that he inspected the home in 2000.  During his inspection, Slider noticed that the home sloped toward the street, there was distress around the house, the pool separated from the perimeter of the foundation, and there was a large crack in the exterior veneer.  The sloping originally occurred because the house had been constructed on a fairly steep sloping embankment without being properly placed, resulting in the house settling and assuming the shape of the slope over time.  As a result of the open joint between the pool deck paving and the house, Slider opined that water collected at the crack and was absorbed into the soil, which led to moisture collecting in the soil under the house and causing the house to heave.  
Slider also testified that although the plumbing leak was not the primary cause of damage to the house, it could have “potentially” contributed to some heaving in the house. 

With competing contentions supported by expert witnesses on both sides, the burden fell on the jury to determine which contention was more credible.  
Turner v. KTRK Television, Inc
., 38 S.W.3d 103, 134 (Tex. 2000) (“Under established Texas jurisprudence, a reviewing court must defer to the fact-finder's credibility determinations because the jury is the exclusive judge of the facts, the witnesses' credibility, and the weight given to their testimony.”).  
We will not second-guess the fact-finder’s determination.  

Having reviewed all the evidence in support of both theories, we conclude that evidence supporting the finding that a plumbing leak caused the foundation damage is not so weak or the evidence to the contrary so overwhelming as to require that the jury’s verdict on the breach of contract claim be set aside.  Thus, we hold there was factually sufficient evidence for the jury to conclude that Allstate breached the insurance policy.  We overrule Allstate’s legal and factual sufficiency challenges to the jury’s finding of breach of contract.

C.  Breach of the Duty of Good Faith and Fair Dealing

The jury determined that Allstate failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when its liability had become reasonably clear and refused to pay a claim without conducting a reasonable investigation of the claim.  Allstate contends that there is legally and factually insufficient evidence to support the jury’s finding.  

An insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims.  
Republic Ins. Co. v. Stoker
, 903 S.W.2d 338, 340 (Tex. 1995); 
Arnold v. Nat’l County Mut. Fire Ins. Co.
, 725 S.W.2d 165, 167 (Tex. 1987).  A breach of the duty of good faith and fair dealing is established when:  (1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy and (2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim.  
Republic Ins. Co.
, 903 S.W.2d at 340.  “The first element of this test requires an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant’s benefits.”  
Aranda v. Ins. Co. of N. Am.
, 748 S.W.2d 210, 213 (Tex. 1988).  This assures that a carrier “will not be subject to liability for an erroneous denial of a claim” as long as a reasonable basis for denial of the claim exists. 
 Id.
; 
see Lyons v. Millers Cas. Ins. Co. of Tex.
, 866 S.W.2d 597, 600 (Tex. 1993).

Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith.
  Transp. Ins. Co. v. Moriel
, 879 S.W.2d 10, 17 (Tex. 1994);
 Nat’l Union Fire Ins. Co. v. Dominguez
, 873 S.W.2d 373, 376-77 (Tex. 1994).  Nor is bad faith established if the evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim or about the proper construction of the policy.  
Lyons v. Millers Cas. Ins. Co.
, 866 S.W.2d 597, 601 (Tex. 1993)  (“[T]he issue of bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim.”).  A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith.  
Id.
  To the contrary, an insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim and that it knew or should have known that fact.  
Transp. Ins. Co.
, 879 S.W.2d at 18.

An insurer's reliance upon an expert's report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable.  
State Farm Lloyds v. Nicolau
, 951 S.W.2d 444, 448 (Tex. 1997).  Evidence casting doubt on the reliability of the insurer's expert's opinions may support a bad-faith finding.  
Id.

Allstate claims that the evidence is legally insufficient to support the finding that it breached its duty of good faith and fair dealing because it reasonably relied on Tolson’s report that the plumbing leak did not cause the foundation damage in denying the claim.  The Masons raise several factors that they claim call into question the reliability of Tolson’s report and the reasonableness of Allstate’s reliance on it and, as a result, shows sufficient evidence of bad faith.   

First, the Masons claim that because Wilson testified that the engineer, i.e., Tolson, was supposed to tell him what tests were needed and Tolson said he did not have authority to recommend testing, Tolson’s investigation of the damage to the house was somehow improper.  We fail to see how this misunderstanding provides any proof that Allstate acted in bad faith.

The Masons claim that Tolson was not present at the house when the plumbing repairs were done, implying that he could not exclude plumbing as the cause of the damage without being present.  The record shows that after the plumbers removed the broken pipes from underneath the house, they laid them out on the ground and “talked [Tolson] through them . . . and [told him] the configuration of the pipe . . . matches up 100 percent with the configuration of the elevations.”  There is no evidence that it was necessary for Tolson to be at the house when the plumbing repairs were conducted in order to exclude a plumbing leak as the cause of the foundation damage.  Incidentally, Linehan was also not present during the repairs, yet he was able to determine that the plumbing leak caused the foundation damage. 

The Masons also claim that even though Tolson testified that “it was customary to take soil tests and to make flow tests in situations such as these,” Tolson did not conduct those tests.  Tolson also testified that while the flow tests would have been helpful, they were not available and were not necessary and that only sometimes does he request soil tests.  According to the Masons, the tests would have revealed how much the pipe was leaking and whether the soil under the west hall bathroom was saturated by rainwater, which would have confirmed Tolson’s theory, or fecal matter and chlorine, which would have shown that a plumbing leak had saturated the soil and caused the foundation damage.  There was no dispute, however, that a plumbing leak existed under the west hall bathroom.  Thus, the soil tests would have revealed sewage and chlorine regardless of the cause of the uplift.  Further, Tolson testified that he did not need the soil tests because he already knew the soil under the house was expanding from moisture.

The Masons also claim that Tolson ignored Wilson’s report that the French drain was working in making his determination that subsurface drainage caused the upheaval.  There is no evidence that Tolson ignored Wilson’s report.  As a matter of fact, Tolson testified that he examined Wilson’s report as part of his investigation.  Although Wilson determined in 1992 that the French drain was working, Tolson concluded that subsurface drainage was still getting past the drain and under the house.  There is no evidence that this conclusion was not made objectively.

The Masons also claim that the jury heard evidence that Allstate’s “witnesses had avoided subpoenas, failed to bring documents to court, and that Allstate had failed to produce pipe for inspection that had been removed from the front yard.”  The Masons have failed to cite to where in the record there is evidence that any witness avoided service.  
See
 
Tex. R. App. P. 
38.1(h).  While the Masons’ trial attorney accused Tolson during cross-examination
 of avoiding service, there is no evidence that he in fact avoided service.  There is also no evidence that Tolson intentionally failed to bring documents to court, and the Masons refer us to no evidence in the record showing that any other Allstate witness intentionally failed to bring documents to court.  
See id.
  Finally, the Masons provide no record reference for their contention that Allstate failed to produce the pipe that had been removed from the front yard.  
See id.
 

The Masons also attempt to discredit Tolson based on the fact that he has worked for insurance companies in the past in conducting investigations.  Although Tolson testified that he received a significant amount of his income from insurers, he testified that he also works for homeowners and that he does not believe that plumbing leaks can never cause foundation damage.  As a matter of fact, before the trial in this case, Tolson had concluded that a plumbing leak had caused foundation damage while working for another insurance company.  He also made a similar conclusion while working for Allstate on a different claim.  The fact that Tolson wants to obtain more business from Allstate, by itself and in conjunction with the above, however, does not show that Tolson was necessarily biased against insureds.

The evidence showed that Tolson conducted an adequate investigation of the house and surrounding property, that he took a history of the house, and that he examined reports regarding the house’s prior foundation problems.  Although Tolson did not determine whether the French drain was working, that fact alone does not indicate that his conclusions were unreliable or that he did not arrive at them objectively.  Tolson testified that in his opinion subsurface drainage could still be moving under the French drain.  Based on the evidence available to Allstate at the time it denied the Masons’ claim, we hold that there is no evidence suggesting that Tolson’s investigation was unreliable and that Allstate acted unreasonably in its reliance on his investigation in denying the Masons’ claim.  Accordingly, we conclude that there is no evidence that Allstate acted in bad faith when it denied the Masons’ claim.  Thus, there is no evidence to support the jury’s verdict that Allstate breached its duty of good faith and fair dealing.  We sustain Allstate’s legal sufficiency challenge to the jury’s finding of breach of the duty of good faith and fair dealing.  Because we conclude that there is no evidence of bad faith, the jury’s finding of malice and punitive damages resulting from bad faith can no longer stand. 

D.  Unconscionable Conduct

The jury also found that Allstate engaged in unconscionable conduct. “‘Unconscionable action or course of action’ means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.”  
Tex. Bus. & Com. Code Ann. 
§ 17.45(5) (Vernon 2003).  Allstate challenges the legal and factual sufficiency of the evidence to support the jury’s finding. 

As proof of unconscionable conduct,
 the Masons point to the letter Allstate sent to them that stated it would attempt to give the Masons “every advantage of your policy.”  The Masons state that the evidence showed at trial that Allstate had no interest in seeing that they received the benefits due to them under the policy.  Instead, the Masons claim that Allstate was interested in performing a sham investigation and denying their claim no matter what the consequences.  We have already held that Allstate did not perform an unreasonable investigation and did not violate its duty of good faith and fair dealing.  Allstate’s letter to the Masons does not show that Allstate attempted to take advantage of the Masons.  Instead, the evidence shows that Allstate paid for the plumbing repairs as required under the insurance policy and  investigated the claim that the plumbing leaks caused the damage to the home.  After determining that the policy did not cover the damage, Allstate denied the claim based on Tolson’s report.  The evidence does not show any unconscionable conduct on Allstate’s part.  We sustain Allstate’s no evidence challenge to the jury’s finding of unconscionable conduct.

E.  
Knowing Violation of the DTPA and Insurance Code

In response to charge question 3, the jury found that Allstate engaged in an “[u]nfair or deceptive act or practice” by making “misrepresentations relating to insurance” that included “[f]ailing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when [its] liability has become reasonably clear” or “[r]efusing to pay a claim without conducting a reasonable investigation of the claim.”  In response to charge question 5, the jury found Allstate committed such conduct knowingly.  Although Allstate and the Masons address on appeal whether there is legally and factually sufficient evidence to find that Allstate committed an unfair or deceptive act or practice 
knowingly
, we must first determine whether Allstate even committed such an act at all.  Neither party concedes that it did.

The question the jury was asked to decide with regard to whether Allstate committed an unfair or deceptive act or practice is the same as the one it was asked to decide with regard to whether Allstate breached its duty of good faith and fair dealing.
(footnote: 5)  Having already determined that Allstate did not breach its duty of good faith and fair dealing, we see no reason to readdress the same evidence here that we examined with regard to that issue.  Based on the charge to the jury, a review of the same evidence would arrive at the same conclusion: There is no evidence to support the jury’s finding that Allstate “[failed] to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when [its] liability has become reasonably clear” or “[refused] to pay a claim without conducting a reasonable investigation of the claim.”
  Thus, we sustain Allstate’s challenge to the jury’s finding that it knowingly engaged in an unfair or deceptive act or practice.

In light of our determination that there is no evidence that Allstate engaged in unconscionable conduct or committed an unfair or deceptive act or practice, the jury’s findings that Allstate acted knowingly in committing such acts and its award of actual and punitive damages for those causes of action can no longer stand.  
Furthermore,
 
because we conclude that no evidence exists to support the jury’s findings that Allstate breached the duty of good faith and fair dealing, engaged in unconscionable conduct, or committed an unfair or deceptive act or practice, it is not necessary for us to address whether the trial court erred in admitting into evidence testimony showing that Allstate did not want to participate in the pretrial appraisal.  
See
 
Tex. R. App. P.
 47.1.
 

V. 
 Conclusion

Having held that legally and factually sufficient evidence exists to support the jury’s finding of breach of contract, and that no evidence exists to support the other complained of findings, we reverse the trial court’s award of exemplary damages and render judgment that the Masons take nothing on their claims for breach of the duty of good faith and fair dealing, unconscionable conduct, and unfair or deceptive act or practice.  We affirm the trial court's judgment of $163,159.76 for breach of contract, $88,561.97 for statutory damages under article 21.55 of the Texas Insurance Code, $74,600 for attorney’s fees, and $49,216.02 for pre- and post-judgment interest.

SAM J. DAY

JUSTICE

PANEL A: CAYCE, C.J.;  HOLMAN, J.; and SAM J. DAY, J. (Retired, Sitting by Assignment).

DELIVERED:
  November 26, 2003

FOOTNOTES
1:
Wilson also observed during his inspection that a neighboring house had window separations, brick cracks, and a barrier around it with a sign that said “danger, structure.”  Other homes on the same street were having similar foundation problems.

2:
Although there were several plumbing leaks, the Masons contend only that the leak in the west hall bathroom was responsible for the damage to the house. 

3:
Linehan testified:

Q.  Now, in this case, did you do any work to see whether the foundation had deformed because of soil movement?

A.  I read--I measured the foundation elevations and observed the structural distresses and the timing of such, combined with Mr. Mason, to form my opinion that there was soil movement caused by the plumbing leak that uplifted the foundation at that location at the bathroom.

. . . .

Q.  So you will agree with me, won't you, that if you have got a foundation that has experienced upheaval to the point that it has deformed the foundation, that the foundation can be subject to seasonal moisture changes, correct? 

A.  No, I will not agree with that at all. 

Q.  Now, what did you do to rule out the possibility that any damage to this occurred--that occurred in 1998 wasn't attributable to the same things that were happening back in January of '92? 

A.  There was no evidence that the failure that occurred in 1992 was present again in 1998, but in 1998, there was a plumbing leak at the hall bathroom.  There was an uplift at the hall bathroom.  There was substantial damage that occurred outside the house in 1998 by Mr. Mason's testimony.  And it also occurred inside the house in 1998, all confined to this area right in here (Indicating).  All the prior problems had been at the rear of the garage, and there is no substantial movement at the rear--rear of the garage in 1998. 

4:
Linehan testified:

Q.  And I had asked you this earlier about the foundation being damaged and needing to be repaired.  Isn't it possible that when you have that occur, the foundation no longer resists movement so it may continue to move during its life during periods of wet or dry weather?  Isn't that true?

A.  If it has been fractured and damaged, it may continue to move due to seasonal moisture changes.  That's right.

Q.  And, for instance, if it is extremely dry, it could start to settle a little, go down lower?

A.  It could.

Q.  Or during periods of heavy rain, go up?

A.  That is correct.  It could rock and roll or it could not move at all.

Q.  Now in this case, with the upheaval that Mr. Wilson mentioned in his January '92 report, you didn't do any kind of investigation, did you, to see if the foundation had been damaged at that point in time to where it could no longer resist movement, did you?

A.  There was no information available to me, sir.

Q.  So you--the answer is you did nothing on that?

A.  No.  I did talk to Mr. Mason, and he hadn't had any signs of foundation movement between 1992 and 1998 when it suddenly began to fall apart.  If you are having foundation movement, you would have seen a series of cracking and breaking occurring between '92 and 1998.  The fact that for six years his house was spotless inside but with maybe one or two minor things and substantially suddenly it began to tear itself apart in 1998, there is very good evidence that it has not been moving due to seasonal moisture changes and was not broken in 1992.  

5:
In the charge, the jury was instructed that it should find Allstate breached its duty of good faith and fair dealing and committed an unfair or deceptive act or practice if evidence existed that Allstate either (1) failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when its liability had become reasonably clear or (2) refused to pay a claim without conducting a reasonable investigation of the claim.