COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-100-CV

 

 

AFE OIL AND GAS, L.L.C. AND                                            APPELLANTS

EXPLO OIL, INC.

 

                                                   V.

 

CHARLES
ARMENTROUT, SUSAN                                  APPELLEES

ARMENTROUT
GIRVIN, LYNN A. 

MORRIS,
SALLY NELMS, AND 

BIRDS FORT LAKE, LTD.                                                                       

 

                                              ------------

 

            FROM THE 48TH DISTRICT
COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Appellants AFE Oil and Gas, L.L.C. and Explo Oil, Inc. appeal from a
judgment in favor of Appellees Charles Armentrout, Susan Armentrout Girvin,
Lynn A. Morris, Sally Nelms, and Birds Fort Lake, Ltd. that a mineral lease had
terminated.  In two issues, Appellants
argue that the evidence is legally and factually insufficient to support the
jury=s finding that the well at issue was not capable of producing gas when
shut-in royalties were tendered.  Because
we hold that the evidence is legally and factually sufficient to support the
jury=s finding, we affirm the trial court=s judgment.

Facts and Procedural History

Appellees Armentrout, Girvin, Morris, and Nelms executed an oil, gas,
and mineral lease with AFE in 1997.  The
lease covered approximately 120 acres of land in the formation known as the
Barnett Shale.  In February 2002, the
same parties executed successor leases in favor of AFE.  One of these leases covered a 40-acre tract,
described as ATract A@; the Armentrout No. 2 well had been drilled on this tract while the
1997 lease was in effect.  This 2002
lease is the lease at issue on appeal. 
AFE assigned a working interest to Explo Oil.  AFE also assigned an interest in the lease to
Premium Resources II (APRII@) through an agreement under which PRII became the designated operator
of the well and AFE maintained a portion of the working interest.  








The lease originally had a primary term of one year; the lease stated
that it would be in effect during the primary term Aand as long thereafter as operations . . . are conducted upon said
land with no cessation for more than ninety (90) consecutive days.@[2]  The term Aoperations@ was defined
as Adrilling, testing, completing, reworking, recompleting, deepening,
plugging back or repairing a well . . . in an endeavor to obtain production of
oil, gas, sulphur or other minerals . . . whether or not in paying quantities.@  The lease further provided
that if the well was not actually producing by the end of the primary term or
at any time thereafter, the well could be shut in for up to ninety consecutive
days, and the lease would not terminate if, by the end of the ninety days,
royalties (called Ashut-in
royalties@) were paid
to the lessors.[3]

On December 16, 2002, the parties executed an agreement to extend the
primary term of the lease on the land on which the well was located.  This agreement stated that the lease would be
in force until August 1, 2003, Aand as long thereafter as oil, gas or other minerals are produced
f[ro]m the [leased land] . . . , and as long as operations as prosecuted under
the terms of the Lease.@ 








PRII began operations on the well on July 30, 2003.  In August 2003, the well was acid perforated,
a technique used to stimulate production of a gas well.  In October 2003, PRII and AFE tendered
payment of shut-in royalties to Armentrout, Girvin, Morris, and Nelms, who
rejected the payments. 

Appellees subsequently brought suit against Appellant AFE seeking a
declaratory judgment that the mineral leases they had executed with AFE had
expired.  They also sought to quiet title
to the land covered by the leases. Appellee Birds Fort Lake, Ltd.,
successor-in-interest to the other Appellees, currently owns the lands covered
by the leases; Appellant Explo Oil intervened because it had acquired from AFE
an interest in the well covered by the leases. Appellees obtained a partial
summary judgment that the 1997 lease had ended on its own terms, but the
parties went to trial over the 2002 lease.








At trial, the parties contested the issue of and produced conflicting
testimony on whether the well could produce natural gas at the time the shut-in
royalties were paid.  Appellants
contended that the lease was extended when shut-in royalties were paid if the
well was capable at that time of producing in any quantity.  The trial court thus submitted this question
to the jury:  ADo you find that in October, 2003, the Armentrout No. 2 Well was not
capable of producing gas?@  The trial court instructed the jury that a
well is not capable of producing gas if the well needs further work, repairs,
or equipment in order to produce gas. 
The jury sent a note to the trial judge asking, A[M]ust the gas be able to flow in order to be considered >producible=?@  The judge then submitted this
supplemental instruction:  AIn response to your question, you are instructed that in order for a
gas well to be >capable of
producing gas=; the gas
must be able to flow.@  The jury found that the well was not capable
of producing gas, and the trial court entered final judgment for Appellees.

Analysis








In Appellants= first
issue, they argue that the evidence is legally insufficient to support the jury=s finding that when shut-in royalties were tendered, the well was not
capable of producing gas.  We may sustain a
legal sufficiency challenge only when (1) the record discloses a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of a vital
fact.[4]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable fact-finder could and
disregard evidence contrary to the finding unless a reasonable fact-finder
could not.[5]  Anything more than a scintilla of evidence is
legally sufficient to support the finding.[6]  








A typical gas lease runs for a set period of timeCthe primary termCduring which
the lessee conducts the necessary operations to complete a producing, and
hopefully profitable, well.[7]  At the end of the primary term, if the well
is producing gas, then the lease typically extends indefinitely for as long as
the well continues to produce.[8]  If the well is not producing gas at the end
of the primary term, the lease will usually end automatically.[9]  To avoid forfeiture of the lease, most gas
leases allow for the lease to be extended even if the well is not producing gas
if shut-in royalties are paid and the well is actually capable of
producing gas.[10]  In other words, if further work on the well
is required before the well will be capable of producing gas, then even paying
shut-in royalties will not prevent the termination of the lease.  The term Acapable of production@ has been held to mean capable of producing gas in paying quantities
where the lease does not define the term.[11]









The February 1, 2002, lease, as amended, at issue in this case had a
primary term that expired on August 1, 2003, but the lease could be continued
in force for up to ninety consecutive days without actual production if
operations were being conducted on the land[12]
or if the well was capable of producing and was shut in for no more than ninety
days.  The well was shut in on August 5,
2003, and shut-in royalties were tendered to Appellees in October 2003.  Appellants contend that the February 1, 2002,
lease required capability of production but not in paying quantities, that Acapable of production@ in this case means that Agas will flow when
[the well=s] switch is turned on,@ and that the
record conclusively establishes that the well was capable of production when
the shut-in royalties were paid.  








At trial, Appellees elicited testimony from several sources that a gas
well in the Barnett Shale will not produce without a fracture stimulation (Afrac@), a
different procedure than acid perforation, and that the well at issue had not
been Afraced@ by the end
of the primary term.  The jury could have
determined that Appellants did not successfully refute this allegation of
scientific fact.  Appellants elicited
some favorable testimony from Sanford Dvorin, who was an officer and principal
of AFE during the relevant time period, is still affiliated with AFE, and
retained an interest in the well at the time of trial.  Dvorin testified that the only way to get a
known quantity of gas from the well was to perform a fracture stimulation of
the shale; he made a similar statement in a letter, admitted into evidence,
that was written after the well had had an acid stimulation performed on
it.  He further testified that with
respect to this well, he would have had to hire a service company, frac the
well, and do mechanical work on it to get the well to produce, all of which had
to be done after October 2003. 








Appellees= expert,
Nick Steinsberger, testified that in August 2003, the well was acid perforated
and swab tested and would not flow on its own after that and that the well was
at that point incapable of producing. 
Although he did testify that the operator report showed that some gas
flowed in August 2003, in the context of his testimony, it is clear that his
testimony was that he believed that the gas was CO2, not natural gas.  Even without considering his testimony as to
the content of the gas from the well, he reiterates throughout his testimony
his belief that the well could not produce without being Afraced.@  He stated that all Barnett Shale wells are
fracture stimulated.  Although Appellants= brief states that Steinsberger testified that a fracture stimulation
was only required for optimal production, in fact Steinsberger testified
that the well was not capable of producing a single McF[13]
of gas without a fracture stimulation. 
He testified that prior to the November 20, 2004, frac job, the well was
not capable of producing, that the well still could not produce a month after
that frac, and on August 5 and in late October and November 2003, the well
could not be turned on and begin to flow. 

Further, in a letter from June 2004, Carlos Sandoval, president of
Explo Oil, stated that the gas purchase contract on the well required gas
samples and volume tests from the well and that Aobviously@ the
purchaser could have neither until the well was Afraced.@  The jurors may have reasonably taken this sentence
to mean that, in Sandoval=s opinion at
least, the well was not capable of producing as late as June 2004 because the
well had not been Afraced@ and the well therefore was not capable of producing when shut-in
royalties were tendered.








Further, the jury could have determined that the testimony and
evidence produced by Appellants was not as reliable as that from Appellees, or
in any event was not any more definitive.[14]  Randy Mosley, Appellants= expert, testified that there was no metering device on the well when
it was shut in and that the estimates he gave at trial as to the production capability
of the well were not based on any measurement of gas produced at the time the
well was shut in.  He further testified
that when he visited the well site in August 2006, after a frac job had been
completed, he had no information to identify the components of the gas the well
produced on that date.  

As for the reliability of Mosley=s testimony, Steinsberger testified that he had completed Aprobably about a thousand wells in the last ten years@ in the Barnett Shale.  Mosley,
on the other hand, testified he had experience with completing and overseeing
only one gas well in the Barnett Shale. 
And on that well, he did not design the frac job, and even that well was
fracture stimulated.  Steinsberger
testified that he has authored numerous papers about the completion technology
in the Barnett Shale, in his belief more than anyone else on the topic, some of
which were for the Journal of Petroleum Technology, an authoritative
journal in the field.  Mosley, on the
other hand, testified that he has not written any articles on the Barnett
Shale.  The jury could have determined
that Steinsberger=s expertise
made his testimony more credible with respect to gas wells in the Barnett
Shale.[15]   








Further, Mosley=s demeanor
on the stand may have affected the jury=s opinion of his testimony.  The
court sustained objections multiple times to Steinsberger=s testimony as being nonresponsive and instructed him to A[b]e responsive to the question,@ but during Mosley=s testimony, the court not only sustained several objections to Mosley=s nonresponsiveness but admonished Mosley himself:

THE
COURT: And I=m
going to instruct you, Mr. Mosley, to answer the question that you=re asked.

 

[MOSLEY]:
All right.

 

THE
COURT: If you=re
not capable of doing that, in the future I=m going to recess the trial
until the morning.  Do you understand my
instruction?

 

[MOSLEY]:
Yes, sir, I do.

 

THE
COURT: Then stop giving nonresponsive answers.

 

[MOSLEY]:
All right.

 

THE
COURT: Stop speaking over the interrogator, and stop directing the interrogator
where to start his question at.

 








Only two questions later, Appellees= counsel once again objected to the nonresponsiveness of Mosley=s answer, at which point the court excused the jury so that it could
invite Appellants= counsel to Avisit with@ his
witness, presumably to instruct him to be responsive to Appellees= questions.  The court also
admonished Mosley in front of the jury for making an extraneous comment,
telling Mosley, A[T]hat=s not called for.@  The jury could have determined
from Mosley=s demeanor
that his testimony was not as credible as Steinsberger=s testimony and that Appellants= evidence overall was not as credible as that of Appellees.

Considering
evidence favorable to the finding if a reasonable fact-finder could and
disregarding evidence contrary to the finding unless a reasonable fact-finder
could not, we hold that the evidence at trial was
at least some evidence that the well was not capable of producing at the time
that the well was shut in and shut-in royalties were paid.  The evidence was therefore legally sufficient
to support the jury=s
finding.  We overrule Appellants= first issue.

In Appellants= second
issue, they argue that the evidence is factually insufficient to support the
jury=s verdict.  An assertion that
the evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial ordered.[16]  We are required to consider all of the
evidence in the case in making this determination, not just the evidence that
supports the finding.[17]  








Appellants did present testimony contrary to the jury=s verdict.  Dvorin testified
that there was a quantity of gas in the well in August 2003, that it was not
true that the well never produced, and that he believed that they could produce
the well.  Mosley testified that he had
determined that on August 6, 2003, the well was capable of producing and was
capable of flowing gas without additional equipment or repairs.  He estimated that the rate of production
would be about 40 McF a day.  He further
testified that although he did not visit the well in August 2003, to some
extent one can determine the physical condition of the well at that time based
on records from that time of the pressure in the well.  Mosley also testified that the acid
perforation done on the well was sufficient pressure to break the formation and
that in his opinion, if the well had been turned on in October 2003, it would
flow, and the production would be natural gas, or at least a component of it would
be. Steinsberger testified that if he had gone to the well in August 2003 and
opened the valve, gas would have flowed and that in October or November 2003,
the well flowed intermittently.  Although
he  testified that, in his opinion, any
gas was likely CO2, the judge instructed the jury that there was no analysis in
the record of whether the gas in the well was CO2 or natural gas. 








Finally, although the well operator=s daily operations report for August 3, 2003, reported Ano gas or very little,@ the report from August 5, 2003, stated  that the well was flowing and that there was A240 lbs casing pressure@ before the well was shut in. 
The operations report listed 330 pounds of casing pressure on August 6,
2003, and 750 pounds of casing pressure on October 27, 2003.

Despite the conflicting testimony, as discussed above, the jury=s finding is not so weak or the evidence to the contrary so
overwhelming that the finding should be set aside.  As discussed above, the jury could have
reasonably determined that Appellants= evidence was not as credible as Appellees= evidence.  We thus hold that
the evidence was factually sufficient to support the jury=s finding.  We overrule
Appellants= second
issue.

Conclusion

Having overruled both of Appellants= issues, we affirm the trial court=s judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL B:   LIVINGSTON, DAUPHINOT,
and WALKER, JJ.

DELIVERED:  March 6, 2008











[1]See Tex. R. App. P. 47.4.





[2]See
Ridge Oil Co., Inc. v. Guinn Investments, Inc., 148
S.W.3d 143, 158-160 (Tex. 2004) (discussing cases construing similar lease
provisions and determining what sort of operations will serve to keep the lease
in force).





[3]See
Reid v. Gulf Oil Corp., 323 S.W.2d 107, 113-14 (Tex. Civ. App.CBeaumont
1959, no writ), aff=d, 161
Tex. 51, 337 S.W.2d 267 (1960) (construing a mineral lease in which the payment
of shut-in royalties could constitute constructive production so as to keep the
lease in force).





[4]Uniroyal
Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, ANo
Evidence@ and
AInsufficient
Evidence@
Points of Error, 38 TEX. L.
REV. 361, 362B63
(1960).





[5]City
of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).





[6]Cont=l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.
1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996).





[7]See
Fox v. Thoreson, 398 S.W.2d 88, 91 (Tex. 1966) (AA >primary
term= is .
. . the period, typically five or ten years, during which a lease may be kept
alive by a lessee by virtue of drilling operations or the payment of rentals,
even though there is no production in paying quantities.@)





[8]See
Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex.
2002) (A[A]
typical habendum clause states that the lease lasts for a relatively short
fixed term of years (primary term) and then >as long thereafter as oil,
gas or other mineral is produced= (secondary term).@)





[9]See
Fox, 398 S.W.2d at 91 (AA primary term is also a
period of time at the end of which the estate granted will terminate but which
estate may be extended by some other provision, usually one for production.@); see
also Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc., 861 S.W.2d 427,
432 (Tex. App.CAmarillo
1993, no writ) (AIt is
the rule that a lease may be kept alive after the primary term only by
production in paying quantities, or a savings clause, such as a shut‑in
gas well clause, drilling operations clause, or continuous operations clause.@).





[10]See
Hydrocarbon, 861 S.W.2d at 432 (noting that Afor a
well to be maintained by the payment of shut‑in royalties, it must be
capable of producing gas . . . at the time it is shut‑in@); see
also Kidd v. Hoggett, 331 S.W.2d 515, 519 (Tex. Civ. App.CSan
Antonio 1959, writ ref=d
n.r.e.) (AShut‑in
royalty payments excuse production only if the well is actually capable of producing
gas in paying quantities.@). 





[11]Garcia
v. King, 139 Tex. 578, 582, 164 S.W.2d 509, 511 (1942) (holding that, where a
lease term was for ten years and Aas long thereafter as oil,
gas, and other minerals is produced from said land hereunder,@ Aproduced@
meant Aproduced
in paying quantities@). 





[12]See,
e.g., Reid, 323 S.W.2d at 113 (holding, in construing similar lease
provision, that drilling or reworking operations would keep the lease in force
if the operations were prosecuted in good faith and with due diligence and with
no cessation of more than sixty consecutive days); but see Ridge Oil Co.,
Inc., 148 S.W.3d at 158-160 (discussing cases construing similar lease
provisions and determining what sort of operations will serve to keep the lease
in force). 





[13]See
Railroad Commission of Texas, Oil and Gas Division, Glossary of Oil and Gas
Terms, http://www.rrc.state.tx.us/divisions/og/glossary.html (last visited Mar.
5, 2008) (defining AMcF@ as A[o]ne
thousand cubic feet of natural gas measured at standard pressure and
temperature conditions@).





[14]See
Turner v. KTRK Television, Inc., 38 S.W.3d 103, 120 (Tex.
2000) (reviewing court must defer to the credibility determinations of the
trier of fact); Allstate Tex. Lloyds v. Mason, 123 S.W.3d 690, 703 (Tex.
App.CFort
Worth 2003, no pet.) (AWith
competing contentions supported by expert witnesses on both sides, the burden
fell on the jury to determine which contention was more credible.@).





[15]See
Turner, 38 S.W.3d at 120; Allstate Tex. Lloyds, 123 S.W.3d at 703.





[16]Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).





[17]Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert.
denied, 525 U.S. 1017 (1998).