STATE FARM LLOYDS, Appellant,

v.

Terry A. HAMILTON, Sr. and Johnnie Hamilton, Appellees.

No. 05–06–01032–CV.

Court of Appeals of Texas,
Dallas.

Aug. 29, 2008.

Armando De Diego, Law Office Armando De Diego, Dallas, Joseph W. Spence, Shannon, Gracey, Ratliff & Miller, L.L.P., Fort Worth, for appellant.

Evan Lane (Van) Shaw, Law Office of Van Shaw, Thomas M. Michel, Griffith, Jay, Michel & Moore, L.L.P., Fort Worth, for appellees.

Before Justices WHITTINGTON, FITZGERALD, and MAZZANT.

## OPINION

Opinion by Justice FITZGERALD.

State Farm Lloyds appeals the trial court's judgment in favor of its insureds, Terry and Johnnie Hamilton. In four issues State Farm challenges the sufficiency of the evidence to support the jury's findings of breach of contract, cost of repair damages, extracontractual violations, and mental anguish damages. We conclude sufficient evidence supports each of these findings, and we affirm the trial court's judgment.

## BACKGROUND

Cases such as this one—involving claims by homeowners against insurers and alleging incorrect coverage decisions and bad-faith conduct—depend overwhelmingly upon their unique facts. Accordingly, we relate the facts of this case in some detail.

The Hamiltons' home was built in 1972, and the structure experienced foundation problems before Johnnie Hamilton purchased it in 1990. Specifically, the west side of the house required "underpinning," which involved footings being inserted to lift the west side of the house, bringing it to level with the remainder of the structure. The Hamiltons did not experience foundation problems after they purchased the house until 2002. They did have some drainage issues on the east side of the house, which lay on a higher slope and did flood at times. The Hamiltons installed a French drain and skirting on the east side of the house, and they had no more flooding problems of consequence after that work was done.[1]

Early in 2003, the Hamiltons called a plumber who identified leaking underneath the television in their living room. But the plumbers could not locate the leak itself. The Hamiltons made a claim on their State Farm policy; the claim was left open when the leak was not located.

During the summer of 2003, Mrs. Hamilton began noticing signs of structural distress, including cracks in sheetrock and doors sticking. In September of that year, the Hamiltons reported concerns about the foundation to State Farm, which then assigned the claim to claims representative Mark Ogle. Ogle spoke to the Hamiltons

---

1. In 2002, the hall bathroom in the Hamiltons' home flooded when a faucet was left on. Plumbers found an obstruction and repaired it.

and then hired Baker Brothers Plumbing to conduct plumbing tests at their home.

On October 6, 2003, the Baker Brothers plumbers went to the Hamiltons' home to investigate the Hamiltons' report. There the plumbers found one leak outside the Hamiltons' home at the master cutoff valve and three in the sewer line inside the structure of the home. Two of the sewer-line leaks were located above the slab: beneath the toilet in the master bathroom and beneath the tub drain in the hall bathroom. Baker Brothers performed flow tests on those two sewer-line leaks and concluded neither caused water loss under normal usage.

The leak at issue in this case was the third sewer-line leak, which was discovered by happenstance. While performing their investigation, Baker Brothers ran a camera through a sewer line that carried effluent from the laundry room and the kitchen. The camera became stuck under the living room, and the plumbers broke through the floor and foundation to retrieve the camera. The excavation revealed a severely deteriorated cast iron pipe and approximately a foot and a half of water in the surrounding area. The plumbers pumped the standing water out and replaced a portion of the broken pipe. They covered the excavation with plastic and plywood, intending to return and close up the hole in three days.

Baker Brothers called Ogle the same day and told him of their findings. Ogle immediately engaged an engineering firm, George Perdue & Associates, to evaluate the Hamiltons' property and to tell him whether any of the leaks Baker Brothers found had caused or contributed to foundation damage in their home. Perdue was on a list of engineers who were approved by State Farm.

Clem Bommarito, an employee of Perdue, performed the engineering analysis at the Hamiltons' home. Bommarito went to the Hamiltons' home on October 8, 2003. The homeowners gave him historical information concerning the house and its plumbing issues, and he did a walk-through inspection. Next he performed an elevation survey, which showed the floor slab to be out of level by some four inches. Finally, Bommarito oversaw the taking and analysis of seven soil samples from the site. Bommarito's report listed the source of each sample and described the soil in the sample.[2] The report sets forth the results of each sample's subjection to the series of tests known collectively as the Atterberg Limit Test. According to Bommarito's tests, the moisture content of the samples ranged from 25 percent to 40.6 percent. The report also assigned scores to the various samples' Liquid Limit, Plastic Limit, and Plasticity Index, the latter being indicative of the "shrink/swell potential" of the soil sample. According to Bommarito, the higher the Plasticity Index score, the greater the soil's potential to swell when exposed to moisture. In the Hamilton samples, the index ranged from 31 to 51.

Three days after the living-room excavation, Baker Brothers returned to the

2. Bommarito's report described the soil samples:

*Sample 1–Southeast corner of the house-Gray Clay with Tan Sand
*Sample 2–Under kitchen line (1'6" south of combo)-Gray Clay with Tan Sand
*Sample 3–Under kitchen sink/washing machine line combo-Gray Clay

*Sample 4–Four (4') feet south of washing machine line combo-Gray Clay with Tan Sand
*Sample 5–Outside master bath toilet-Olive and Gray Clay
*Sample 6–Under washing machine line (2' east of combo)-Medium Brown Clay
*Sample 7–Under washing machine line (2' west of combo)-Dark Brown Clay

Hamiltons' home to close up the hole. However, the excavation was again full of standing water. The plumbers opined the water was from "ground seepage" they had "expected to see," and they proposed filling the hole. The Hamiltons, believing the problem had not been resolved, refused to allow the hole to be filled. The living room excavation remained open at the time of trial.

Bommarito's report for George Perdue & Associates (hereafter the "Perdue Report") is dated November 5, 2003 and was received on November 6 at State Farm's claims department. The report concluded the plumbing leaks did not "influence the slab of the Hamilton home."

By letter dated November 11, 2003, Ogle told the Hamiltons that, based on the Perdue Report, State Farm had concluded the leaks discovered by Baker Brothers did not cause foundation damage to the Hamiltons' home. Ogle informed them that State Farm was denying their claim.

The Hamiltons retained Ralph Mansour, a structural and geotechnical engineer, to provide a second opinion in the matter. Mansour initially met with the Hamiltons on December 31, 2003. He inspected the home (including the living room excavation, which still contained standing water), performed his own elevation survey, took photographs, and took external borings from the southeast and northwest corners of the house. Mansour reviewed the Perdue report, performed his own analysis, and issued his conclusions in report form. Mansour's report concluded that the plumbing leak under the living room caused the Hamiltons' foundation damage. Mansour's causation opinions represent the gist of State Farm's appeal; they are

discussed in more detail under corresponding appellate issues.

The Hamiltons sued State Farm and Ogle; they eventually non-suited Ogle. A jury found in favor of the Hamiltons and against State Farm on each of the Hamiltons' claims and awarded damages. The trial court's judgment awarded the Hamiltons actual damages for breach of contract and for violation of the Texas Insurance Code. The judgment also included an award of attorney's fees, costs, pre- and post-judgment interest, and an insurance code penalty. State Farm appeals.

### STANDARD OF REVIEW

State Farm challenges the legal and factual sufficiency of the evidence supporting the jury's findings assessing liability for breach of contract and extracontractual violations. It also challenges the legal sufficiency of the jury's damages awards.[3] To evaluate the legal sufficiency of the evidence to support a finding, we must "determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994). We view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex.2005). To evaluate the factual sufficiency of the evidence to support a finding, we consider all the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

---

3. State Farm poses its challenge to the trial court's judgment in four issues. The Hamiltons restate the challenge in seven issues, but they do not raise any independent cross-points.

However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Mayhew v. Dealey*, 143 S.W.3d 356, 368 (Tex.App.-Dallas 2004, pet. denied).

## LIABILITY FOR BREACH OF CONTRACT

In its first issue, State Farm argues the evidence is both legally and factually insufficient to support the jury's finding that State Farm breached its contract with the Hamiltons. That contract provided coverage to the Hamiltons for foundation damage if and only if the damage was caused by a plumbing leak. The Hamiltons' expert, Ralph Mansour, testified that in his opinion the foundation damage in this case was caused by a plumbing leak. State Farm contends Mansour's testimony was insufficient to support the jury's verdict on three grounds. We address these contentions in turn.

### *Was Mansour's Causation Testimony Admissible?*

■ State Farm contends initially that Mansour's testimony should have been excluded at trial because it was unreliable. Specifically, State Farm challenges the reliability of Mansour's causation opinions, which were the sole evidence tying the Hamiltons' foundation damage to plumbing leaks. State Farm challenged the relevant testimony from Mansour in the trial court, but the trial court refused to exclude the opinions.[4]

Mansour based his fundamental conclusions in this case on facts concerning the nature of the soil underlying the Hamiltons' home. Mansour testified that his observations of the site and of the soil samples taken from the site led him to conclude the home was built on a cut-and-fill site, i.e., a site in which soil from the higher elevation of the site on the east was graded and added to the area of lower elevation of the site on the west to produce a level site for building. Mansour testified that the clay soil remaining on the eastern "cut" side of the house would swell when it was exposed to sufficient moisture. The clay soil on the western "fill" side of the house, being less dense, would settle when exposed to such moisture. Thus, Mansour testified, over time and given sufficient moisture under the house, the foundation of the house would tend to tilt, as the Hamiltons' foundation did.

■ An opinion based on unreliable scientific data is inadmissible as it is nothing more than the expert's subjective belief or speculation. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995). The trial court must determine not whether the expert's conclusions are correct, but only whether the analysis used is reliable considering all the evidence. *Keo v. Vu*, 76 S.W.3d 725, 734 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). A trial court properly excludes expert testimony as unreliable if: (1) the foundational data underlying the opinion is unreliable; (2) the methodology used by the expert to interpret the underlying data is flawed; (3) notwithstanding the validity of the underlying data and methodology, there is an analytical gap in the expert evidence; or (4) the expert fails to rule out other plausible causes. *Allstate Tex.*

---

4. The trial court did exclude some of Mansour's opinions concerning "the area outside the zone of correlated distress" found in Plate 2 of Mansour's engineering study. Mansour thus was allowed to opine concerning conditions in the living room and the areas immediately adjacent to that room. The Hamiltons have not challenged the trial court's ruling on appeal.

*Lloyds v. Mason,* 123 S.W.3d 690, 698 (Tex.App.-Fort Worth 2003, no pet.). The record before us includes sufficient evidence to support the trial court's conclusion that Mansour's analysis satisfied these criteria.

The data on which Mansour relied included the very same data on which State Farm relied *plus* the data Mansour gathered in his own investigation. Thus, in reaching his conclusions, Mansour considered: Bommarito's account of the history—and Bommarito's walk-through—of the Hamiltons' property; Bommarito's elevation study of the home; and the soil samples obtained by the Perdue team as well as the results of tests Bommarito performed on those samples. Mansour also relied on his own elevation study, soil samples, borings, and test results. And State Farm has not challenged any methods of testing employed by Mansour. State Farm cannot successfully argue Mansour's data or methodology is unreliable.

■ An expert's testimony can be unreliable if there is too great an "analytical gap" between the data and the opinion proffered. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex. 1998). *Gammill* was, in part, a defective seat belt case. The supreme court analyzed the challenge in that case to an expert's reliability this way:

> The "analytical gap" between the data in this case and [the expert's] opinion was not shown to be due to his techniques in assessing the vehicle restraint system. On the contrary, [the expert] based his conclusions on observations and testing similar to those employed by defendants' experts. Rather, the "gap" in [the expert's] analysis was his failure to show how his observations, assuming they were valid, supported his conclusions that [the injured passenger] was wearing her seat belt or that it was defective.

The district court was not required, in [*General Elec. Co. v.*] *Joiner*'s [522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)] words, "to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."

*Id.* at 727. We have concluded that Mansour—like the expert in *Gammill*—based his conclusions on observations and testing similar to those employed by State Farm's experts. The question under this factor is whether Mansour—like the expert in *Gammill*—failed to show how his observations, assuming they were valid, supported his conclusion that the plumbing leaks in the Hamiltons' home caused the damage to their foundation.

State Farm argues that the connection between Mansour's observations and conclusions is based on no more than Mansour's *ipse dixit.* We disagree. Mansour's conclusions rely on certain agreed facts (e.g., the presence of a leak and a significant amount of water under the living room's foundation) and agreed opinions (e.g., undisturbed clay soil will swell when infused with significant amounts of water). Mansour's conclusions also rely on other facts (e.g., the western side of the site was composed of fill soil) and opinions (e.g., fill clay soil will settle when infused with significant amounts of water) that are not challenged by State Farm in any meaningful way. No State Farm witness contested these facts at trial, and no State Farm expert testified that he disagreed with these opinions. Mansour's opinions sufficiently connected observations and data concerning the leak, the soil samples, and the foundation's movement. The jury could have accepted Mansour's theory that the swelling on one side of the foundation, together with settling on the other side of the foundation, could have resulted in the four-inch "tilt" of the home, centered as

the tilt was on the critical zone around the large living room leak. We find no analytical gap between Mansour's data and opinion.

Finally, we know an expert's testimony on causation can be unreliable if the expert fails to rule out other plausible causes. *See Mason*, 123 S.W.3d at 698. State Farm argues that Mansour failed to rule out "historical facts reasonably explaining why the Hamiltons' entire foundation tilted 4–1/2″ from east to west." Although State Farm does not elaborate on specific "historical facts" under this topic, in other portions of its brief State Farm stresses two circumstances in the home's history: (1) the placement of footings (before Mrs. Hamilton bought the property in 1990) to lift the sunken west side of the house; and (2) installation of a shelf and French drain (in 1995) to resolve a flooding problem on the east side of the house.[5] According to State Farm, these historical facts support a conclusion that uncorrected flooding issues on the east side of the house were at the heart of the foundation problems. According to State Farm's expert, the east-side flooding was coupled with vegetation-induced drying of the soil on the west side of the house, leading to the foundation's tilt. Despite State Farm's argument to the contrary, Mansour did challenge this conclusion in his testimony. He pointed to Perdue's own soil samples, and explained that the sample with the *least* moisture was taken from the east side where the french drain was located. Mansour also pointed out that the east side of the house did not contain any cracking or other signs of foundation movement. Instead, those stress signs were found in the central portions of the

home, closer to the significant plumbing leak.

Our review of Mansour's trial testimony convinces us he understood the requirement that all other possible causes be eliminated before he could conclude the foundation damage was caused by a plumbing leak. Indeed, Mansour called this obligation "fair reporting." To that end, Mansour challenged the following assertions in the Perdue report:

- The report stated the slab was relatively flat and the small change in elevation is consistent with the poor drainage along the east side of the home causing higher soil moisture and volume increase from east to west. Mansour testified that Perdue took no samples from the west side for comparison purposes, and thus has no data to support his conclusion;

- The report concluded the west side of the house dried up because of the vegetation. Mansour replied that the soil samples taken on the north side, where there were bushes, indicated the soil was moist; he questioned why vegetation would not have caused that soil to dry up as well if vegetation were the operating factor.

- The report stated that the plumbers' flow tests showed no loss of water from leaks in the Hamiltons' home. Mansour pointed out that the plumbers did not flow test the leak from the combination kitchen-washer line under the living room where the camera got stuck.

In summary, Mansour criticized the Perdue opinion because, while it acknowledges the moisture in the soil, it concludes the foundation tilted because the soil under

5. The Hamiltons call this argument a red herring, claiming that no expert at trial attributed their current foundation problems to these "historical" problems. Based on our review of the record, it is fair to say these historical circumstances were raised by State Farm's witnesses and their reports.

the house dried up. Mansour stressed that when water stands for three to four months, the soil around it must be saturated, and the soil samples taken a short distance from the standing water establish that the soil was not dried out. We conclude Mansour adequately addressed and ruled out other causes of the foundation movement in this case.

Mansour made the same type of inquiries and performed the same tests State Farm's expert did. Indeed, Mansour reviewed and relied upon State Farm's own expert's findings. Mansour does interpret some of those test results and findings differently, but he testified at length concerning the bases for his interpretations. It was for the jury to determine which interpretation of the data and methodology was persuasive. *Pilkington v. Kornell,* 822 S.W.2d 223, 230 (Tex.App.-Dallas 1991, writ denied)("It is within the province of the jury to decide which expert witness should be credited."). Mansour's testimony was sufficiently reliable in this case; the trial court did not err in admitting his expert opinions.

### *Was Mansour's Percentage–of–Loss Testimony Conclusory?*

State Farm next argues the evidence was both legally and factually insufficient to support the jury's finding that eighty percent of the foundation damage was caused by plumbing leaks. Mansour testified that, in his expert opinion, eighty percent of the damage sustained by the Hamiltons was caused by the living room plumbing leak. State Farm complains that Mansour's testimony was conclusory. An expert's opinion is conclusory if it is offered with no factual substantiation. *United Servs. Auto Ass'n v. Croft,* 175 S.W.3d 457, 463–64 (Tex.App.-Dallas 2005, no pet.) (citing generally *Coastal Transport Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227 (Tex.2004) and *Burrow v.*

*Arce,* 997 S.W.2d 229, 236 (Tex.1999)). A conclusory opinion will not support a verdict; the expert must explain how he reached his conclusion. *Croft,* 175 S.W.3d at 464. However, "[t]he insured is only required to provide some reasonable basis for the jury's finding and is not required to allocate the plumbing leak damage with mathematical precision." *United Servs. Auto. Ass'n v. Mainwaring,* No. 05–03–01250–CV, 2005 WL 667683, at *4 (Tex. App.-Dallas March 23, 2005 pet. denied) (not designated for publication) (citing *Wallis v. United Servs. Auto. Ass'n,* 2 S.W.3d 300, 304 (Tex.App.-San Antonio 1999, pet. denied)). Our review of the record establishes that Mansour's opinion was based on the tests and analyses he performed concerning all the damage to the house. His opinion was some evidence of the relevant percentage, and because it was based on specific facts and analysis, the opinion was not conclusory. *See Croft,* 175 S.W.3d at 464.

### *Was Mansour's Causation Testimony Conclusory?*

Finally, State Farm charges that if Mansour's causation opinion is admissible, it is nonetheless insufficient to support the jury's findings because the opinion is conclusory. Again, an expert's opinion is conclusory only if it is offered with no factual substantiation. *Id.* at 463–64. We have laid out in some detail the testing and analysis performed by Mansour. All of the data and all of his reasoning was placed in evidence. The jury was free to accept or reject Mansour's opinions, but they were not conclusory. *See id.*

In conclusion, Mansour's challenged opinions were not unreliable; the trial court did not err in allowing the Hamiltons to offer those opinions. In addition, once admitted, the opinions were not concluso-

ry, but were based on facts and analyses that were made available to the jury. Accordingly, Mansour's opinion that the Hamiltons' foundation damage was caused by plumbing leaks was legally and factually sufficient to support the jury's finding that State Farm breached its contract in this case. We resolve State Farm's first issue against it.

## LIABILITY FOR EXTRACONTRACTUAL VIOLATIONS[6]

 Concluding State Farm breached its contract does not equate to concluding State Farm acted in bad faith in denying the Hamiltons' claim. An insurer does not breach its duty of good faith merely by erroneously denying a claim. *U.S. Fire Ins. Co. v. Williams,* 955 S.W.2d 267, 268 (Tex.1997) (citing *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 17 (Tex.1994)). Evidence showing a coverage dispute does not, by itself, demonstrate bad faith. *Williams,* 955 S.W.2d at 268. Instead, an insurer breaches its duty of good faith and fair dealing when the insurer fails to settle a claim if the insurer knew or should have known that it was reasonably clear that the claim was covered. *See Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 56 (Tex.1997). "[A]n insurer's reliance on an expert report, standing alone, will not necessarily shield the carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable." *State Farm Lloyds v. Nicolau,*

951 S.W.2d 444, 448 (Tex.1997). Whether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is a question for the fact-finder. *Giles,* 950 S.W.2d at 56.

Texas courts have issued a significant number of opinions addressing very similar issues of an insurer's good faith in dealing with its insured's claims for foundation damage. Some cases are resolved in the insurer's favor, some in the insured's. Appellant relies heavily on this Court's opinion in *Croft,* a case in which this Court concluded there was no evidence supporting the jury's finding of breach of the duty of good faith and fair dealing. *See Croft,* 175 S.W.3d at 471. Appellee, in turn, relies on *Mainwaring,* a case in which this Court concluded sufficient evidence supported the jury's finding of breach of the duty of good faith and fair dealing. *See Mainwaring,* 2005 WL at 667683 *7–8. Both cases relied on by the parties are rooted in the Texas Supreme Court's 1997 pronouncements on this issue in *Giles* and *Nicolau.* And in the end, the principles of those seminal cases, applied to the specific facts of the case, must govern.

 In this case, the fact-finder concluded that State Farm acted in bad faith by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when its liability had become reasonably clear. State Farm ar-

---

**6.** The Hamiltons alleged both violations of the Texas Insurance Code and a breach of State Farm's common law duty of good faith and fair dealing. Both theories were submitted to the jury; both questions included the same instruction premising liability on the same standard:

> Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear.

The jury answered the two questions identically. In this opinion we will sometimes speak generally to extracontractual violations or to bad faith. Like the trial court and the parties, we will treat the two alleged violations as identical in terms of liability. *See, e.g., Progressive County Mut. Ins. Co. v. Boyd,* 177 S.W.3d 919, 922 (Tex.2005) (common law bad faith standard is same as statutory standard under article 21.21 of insurance code).

gues the evidence is both legally and factually insufficient to support the jury's findings of extracontractual liability. According to State Farm, the Hamiltons' extracontractual claims are based on a single allegation: that State Farm hired a biased and non-independent engineer, Perdue, to investigate the claim. State Farm, of course, disputes that Perdue was biased in favor of State Farm when he performed his investigation. It points to the testimony of Ogle, Perdue, Bommarito, and Linda Rogers (State Farm's claims team manager), all of whom testified to Perdue's independence and to the fact that they did not keep track of "outcomes" or "percentages" when it came to Perdue's opinions. The jury could have believed or disbelieved any part of that testimony. There was also evidence that: Perdue was on the list of State Farm's approved engineers; more than fifty percent of Perdue's business came from State Farm; Perdue had investigated 1440 claims for State Farm; State Farm had paid Perdue's company more than $3 million between January 1999 and December 2003; Ogle had been using Perdue for ten years; and Perdue had never testified against State Farm's interests.[7] All of the witnesses who were asked testified that independence was important in this kind of investigation. Thus, if jurors believed Perdue was *not* independent, they could have reasonably concluded his report was not objectively prepared and that it was not reasonable for State Farm to rely on it. *See, e.g., Nicolau,* 951 S.W.2d at 448 ("evidence casting doubt on the reliability of the insurer's expert opinions may support a bad-faith finding"); *Mason,* 123 S.W.3d at 704 (same).

■ Evidence of an investigator's biased views, standing alone, will not always be evidence of bad faith. *Nicolau,* 951 S.W.2d at 449. But the Hamiltons deny that their bad-faith claims are limited to the biased-investigator point. In their briefing, the Hamiltons make eight more specific charges that allegedly support their claim of bad faith:

- Perdue and State Farm did not rule out other possibilities.
- Perdue and State Farm stated the east side of the home was wet, but their soil sample showed it was dry.
- Perdue and State Farm had no soil samples on the west side of the house to support their contention that the west side of the house was dry.
- Perdue and State Farm say flow tests support their contention that the plumbing leak did not cause the problem, but there was no flow test on the living room leak.
- Perdue and State Farm's conclusion of no liability is not supported by facts.
- Perdue and State Farm's conclusion that the house being four inches out of level is acceptable.
- Perdue and State Farm fail to identify stress signs.
- "The face of the report had problems with the honesty of the report."

Some of these charges are repetitive of or extensions of the breach-of-contract allegations; those facts have already been addressed, and we are mindful that extracontractual liability requires more than mere breach. However, some of the Hamiltons' allegations may well speak to the jury's

---

7. The numbers were also significant for Perdue's employee, Bommarito, who testified he had done "seven or eight hundred" cases for State Farm over several years. Sixty or seventy of those had been during his time with Perdue's company.

Likewise, John Bryant testified he had done two or three reports a month for State Farm involving plumbing leaks and foundation issues. He estimated he had done seventy such reports in three years.

conclusion that State Farm did not deny the claim in good faith. Mark Ogle made the decision, on behalf of State Farm, to deny the claim. He testified his conclusion was based upon the Perdue Report. But his reliance on the Perdue Report, standing alone, will not shield State Farm if there is evidence that the report was not objectively prepared or if Ogle's reliance on the report was unreasonable. *See id.* at 448.

The jury could have perceived conflict within the Perdue Report. We have already discussed the difference between the moisture of the soil samples and the moisture of the soil as Perdue described it in his conclusions. We note as well that the report describes three ways that moisture from plumbing leaks can cause foundation movement. Perdue's conclusions point consistently to just one of these ways: heaving. In the absence of heaving, Perdue (and all of State Farm's witnesses) refused to attribute foundation movement to the plumbing leak. However, the report describes the possibility of the foundation sinking or settling in the presence of more moisture than the soil can absorb. Given the level of water found surrounding the living room leak, the report itself could support a conclusion that the saturated soil could not support the foundation, and it settled. The jury could have wondered why State Farm did not seek to eliminate this possibility set forth in its own expert's report.

The jury could also have perceived an incomplete basis for some of the report's conclusions. The report set forth a number of possible causes of foundation move-ment, including construction issues, erosion issues, and moisture-related issues.[8] The report concluded that the foundation's tilt upward on the east side of the house was consistent with poor drainage on that side, which caused the moist clay soil to increase in volume. And the tilt downward on the west side of the foundation, according to the report, was consistent with greater moisture absorption by site vegetation, which caused the clay soil to shrink.[9] Thus, the report's conclusions were moisture-based, but they were tied to historical conditions. The jury could have wondered why the report failed to consider that the most dramatic presence of moisture under the foundation—the standing water around the broken pipe under the living room foundation—was not considered in the moisture-causation calculus. That moisture was present and visible at the time of the Perdue analysis, yet the report relied on moisture conditions that had existed years before, i.e., drainage and underpinning concerns the homeowners testified were resolved long ago.

Indeed, the jury may have believed that State Farm failed to address the major leak under the foundation in any satisfactory manner. No flow test was ever performed on the leak after it was supposedly repaired. But mere days after the leak was supposed to have been repaired, and after all the standing water was removed from the excavation, the parties observed the excavation fill up with water again. Then, months later when Mansour performed his inspection, there was still sixteen to twenty inches of water in the excavation. The report speculated that this

---

8. Moisture-related issues included plumbing leaks, moisture absorption by root systems, ponding of water near the foundation, lack of proper irrigation, and soil shrinkage during dry weather.

9. Despite the fact that Perdue's soil samples established differences in appearance and plasticity in the soil from different areas, the report's conclusions appear to ignore any possible differences in how the soil would react to more or less moisture.

standing water "could be due to water previously discharged into the soil during static testing and/or may have some natural perched groundwater origin." But no further testing or observation was performed to determine whether either of these possibilities was truly the cause of the standing water. In fact, State Farm also offered testimony that the clay soil under the corroded pipe could have "sealed" the pipe, so that the water might not have been from the plumbing leak at all. No State Farm witness could tell the jury how much water was discharged from the leak under the living room, but the report concluded it was not enough to move the slab.

For any or all of these reasons, the jury could have concluded the original investigation into the central leak, or the follow-up to that initial investigation, or the reliance on the report of the investigation was not reasonable.

*Nicolau* concludes its bad-faith sufficiency review with the following statement:

> Were we the trier of fact in this case, we may well have concluded that State Farm did not act in bad faith. That determination is not ours to make, however. Instead, the Constitution allocates that task to the jury and prohibits us from reweighing the evidence, as the dissent does. *See* TEX. CONST. art. I, § 15 and art. V, § 10; art. V, § 6. Accordingly, viewing the evidence in the light most favorable to the Nicolaus, we hold that there is some evidence to support the jury's finding that State Farm denied the Nicolaus' claim in bad faith.

951 S.W.2d at 450. Likewise, when we view the evidence in the light most favorable to the Hamiltons, we conclude there is some evidence to support the jury's finding that State Farm denied their claim in bad faith. The evidence is legally sufficient to support a finding of extracontractual liability.

We conclude further that the evidence was factually sufficient to support the jury's findings on extracontractual liability in this case. In its breach-of-contract deliberations, the jury was required to choose between alternative theories as to why the Hamiltons' incurred damage to their foundation. Having concluded that Mansour's theory was the correct one, the jury was required to decide whether State Farm's denial of the Hamiltons' claim was made in bad faith. That decision required jurors to judge the credibility of lay witnesses and conflicting expert witnesses. Jurors could believe all, part, or none of each witness's testimony. Looking at the entire record, and all the evidence presented, the jury could have found that State Farm's explanation for the denial of the Hamiltons' claim was not credible and that State Farm denied the claim after it knew or should have known it was reasonably clear the claim was covered. We cannot conclude the jury's determinations in the case were so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

We decide State Farm's third issue against it.

#### COST-OF-REPAIR DAMAGES

■ State Farm's second issue argues the evidence is legally insufficient to support the jury's award for the cost to repair the structural and cosmetic damages sustained by the Hamiltons' home because of the plumbing leaks. State Farm argues initially that the cost-of-repair damages cannot be affirmed because there is no evidence to support its liability for either breach of contract or extracontractual violations. We have ruled against State Farm on these substantive points, so it

cannot prevail on derivative damages arguments.

State Farm also contends that Mansour's opinion as to the type of repairs necessary is "unreliable and constitutes no evidence to support a repair damage award." Mansour testified that the Hamiltons' home required full exterior and interior piers under the entire foundation. He explained that the piers were necessary for two reasons. First, the house was sloping from west to east and needed to be lifted; given the existing slab foundation, lifting the house would require piering support under the interior of the house as well. Second, the house had "this enormous amount of water underneath it"; when the water eventually dried up, the house would "dish back again."

State Farm does not challenge the accuracy of Mansour's opinions. Instead, it argues that we should disregard the opinions because they were actually excluded by the trial court in State Farm's pre-trial expert challenge. We disagree. The trial court's exclusionary ruling was not related to repairs, or to damages for cost of repairs, in any fashion. Rather, the trial court excluded Mansour's causation opinions concerning leaks and water movement outside of what she called the zone of correlated distress.[10]

Our understanding of the trial court's pre-trial ruling is supported by the record at trial. For example, Mansour's report—which was admitted into evidence—outlines his plan of repair and includes a diagram of the interior and exterior piering that Mansour recommended. The trial

court did not order these portions of the report redacted. Moreover, when Mansour was asked to explain his plan of repair at trial, he testified without objection from State Farm. The record before us does not support State Farm's contention that the trial court struck Mansour's opinion concerning repairing the Hamiltons' home.

Mansour's opinion was some evidence in support of the jury's finding of cost-of-repairs damages. As to the cost of the repairs recommended by Mansour, the Hamiltons offered the testimony of John Freeman, a general contractor specializing in residential remodeling. Freeman reviewed Mansour's report and prepared a bid for Mansour's plan of repair. Freeman's total bid was $72,800, which, he testified, was reasonable and necessary for this type of work in the North Texas area. Freeman's bid included the cost of foundation piering and cosmetic repair to the Hamiltons' home. Ample evidence supported the jury's award.

We overrule State Farm's second issue.

### MENTAL ANGUISH DAMAGES

■ Finally, in its fourth issue State Farm argues there is legally insufficient evidence to support the jury's award for mental anguish damages. Our supreme court has stated that mental anguish awards will pass a legal sufficiency review if evidence is presented describing "the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995).

---

10. This area was clearly marked on a page of Mansour's report, to which the trial court referred. It covers the area of the living room excavation and adjoining areas.

When making her "partial strike," the court specifically pointed to opinions "about the laundry room" and to "distress [that] kind of

oozed all over the place." As to the latter point (i.e., what the court characterized as oozing distress), the court clarified her limitation on Mansour's testimony concerning what was caused by the leak in the living room's zone of distress.

Terry Hamilton testified concerning how he felt when State Farm denied the claim. He stressed that the home was the couple's main asset. He felt violated by the refusal. Terry testified that he was diagnosed with depression and has taken medication for that condition. He also related a number of other health problems he was undergoing at the time, including a heart transplant. He worries about his health because he has a very suppressed immune system as a result of the transplant, and he does not know how safe the house is. He does not sleep well. He attributed ninety percent of his emotional problems to this situation, citing financial worries and constant and severe feelings of violation. Terry conceded he and wife had other problems, but he testified these plumbing issues had caused "a lot of emotional problems in [their] marriage."

Johnnie Hamilton testified concerning her own emotional response to State Farm's denial of the claim:

> I went through a variety of emotions. I felt violated. I felt hurt. I felt betrayed. I felt let down. It was just like a flood of emotions came in. Not all at one time, but like one emotion would come and then another emotion.

Johnnie went on to say that the "roller coaster" of emotions had not let up. She testified she still had nights when she cried herself to sleep over her home, which she thought she had done everything possible to protect. Johnnie testified that these emotions sometimes make her feel physically ill and often make her cry. Along with feeling the loss of her home, she worries about the safety issues involved with Terry being there; she has a constant fear that, because of his suppressed immune system, he will become ill and die. She described her home-related problems as severe, constant, frustrating, helpless, and depressing.

We conclude the Hamiltons' testimony adequately describes the nature, duration, and severity of their mental anguish. Their testimony is sufficient to establish a substantial disruption in their daily routine as a result of State Farm's handling of their claim. *See Parkway*, 901 S.W.2d at 444. We overrule State Farm's fourth issue.

### CONCLUSION

We have decided each of State Farm's issues against it. Accordingly, we affirm the judgment of the trial court.