

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00513-CV

_____

Z2Z CAPITAL, LLC, Appellant

V.

MATTHEW AND RILEY ROSE, LLC, Appellee

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-330663-21

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellant Z2Z Capital, LLC (Landlord) appeals from the final judgment in this dispute with its tenant, Appellee Matthew and Riley Rose, LLC (Tenant). Landlord sued Tenant for breach of the parties' commercial lease agreement (the Lease) based on Tenant's payment of a reduced rent amount for multiple months. Tenant countersued for, among other claims, Landlord's failure to abate Tenant's rent after water pipes on the premises burst. The trial court granted partial summary judgment for Tenant; the order dismissed Landlord's claims against Tenant and rendered judgment against Landlord on Tenant's rent abatement claim. Tenant then filed a motion for final judgment and attached evidence to prove up its damages on the rent abatement claim and its attorney's fees. After a hearing, the trial court signed a final judgment awarding Tenant $89,827.61 in rent abatement damages, plus interest, costs, and attorney's fees.

On appeal, Landlord argues that the trial court erred by granting Tenant's motion for partial summary judgment on Landlord's breach of lease claim and by determining that Landlord was liable on Tenant's rent abatement claim. Landlord additionally complains about the trial court's proceeding with a bench trial five days before the scheduled trial date, the trial court's determination of Tenant's damages, and the attorney's fees award. Because Tenant's summary judgment evidence was sufficient to establish that it had not breached the Lease but was insufficient to establish Landlord's liability for rent abatement, we will affirm in part and reverse in part, and we will remand for further proceedings.

2

## Background

### I. Suit for Unpaid Rent/Countersuit for Rent Abatement

Tenant operates a daycare business at the leased premises. In March 2020, due to COVID-19, it suffered a serious decline in enrollment and revenue. In May 2020, Tenant and Landlord executed a Fifth Amendment to the Lease, which deferred rent for April and May 2020 and deferred part of each month's rent from June to November 2020. The Fifth Amendment required Tenant to pay those deferred amounts over 72 months beginning in December 2020. However, Tenant did not pay its full rent in December because, as discussed more fully below, in November the parties exchanged emails agreeing to extend the Fifth Amendment through February 2021 (the Sixth Amendment). Then, in February 2021, pipes on the premises burst after a winter storm event.

In December 2021, Landlord sued Tenant for breach of contract. In its second amended petition, it alleged that Tenant had breached the Lease "repeatedly by failing to pay full rents timely since April 2020." Landlord also alleged that in February 2021, after the winter storm caused the building's pipes to burst, Tenant filed a claim with its insurance company but used the money it received toward restoring the building and for its lost revenue and other expenses rather than assigning the proceeds to Landlord, which Landlord alleged was required by the Lease. Landlord claimed unjust enrichment by Tenant, alleging that Tenant had already received insurance payments for its "lost revenue and extra expenses" but was "seeking double recovery" by asking Landlord to

waive rent. Landlord further asserted a claim for negligent misrepresentation based on Tenant's allegations that COVID-19 had caused it to lack funds to pay rent, which led to the Fifth Amendment. Finally, Landlord requested declarations regarding its lack of obligation to abate rent because of the winter storm damage, its obligations under the Fifth Amendment, and its right to attorney's fees.

Tenant counterclaimed with its own breach of contract claims. Under Section 9.2(c) of the Lease, if a casualty occurs that precludes Tenant from conducting its business, rent is abated until completion of repairs. Tenant alleged that after the winter storm event damaged the premises, Tenant had to continue pay rent while Landlord did nothing to repair the building. Tenant further claimed that Landlord's failure to repair the building was a breach of the Lease and deprived Tenant of quiet enjoyment of the premises. Tenant requested declarations that rent was abated under the Lease for the period when the premises was under repair and that rent had been partially deferred under the Fifth Amendment—extended by agreement per the Sixth Amendment—and was not fully due until March 2027. Finally, Tenant requested attorney's fees under Texas Civil Practice and Remedies Code Sections 37.009 and 38.001. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.009, 38.001.

## II. Partial Summary Judgment

Tenant filed a traditional motion for summary judgment. The motion asserted that Tenant's summary judgment proof conclusively negated Landlord's breach of contract claim. Specifically, Tenant alleged that it had not breached the Lease because

4

it had paid as agreed in the Sixth Amendment and because the Lease did not require Tenant to turn over insurance proceeds; that Landlord had failed to perform under the Lease because it did not abate the rent and had threatened to lock Tenant out of the premises; that Landlord had not sustained any damages; and that Landlord's negligent misrepresentation, unjust enrichment, and declaratory judgment claims failed as a matter of law.

To show that the parties had made a Sixth Amendment deferring part of Tenant's rent between December 2020 and February 2021, Tenant relied on an email exchange between the parties. The first email was from Tenant's co-owner Kristin Sherman to Landlord's co-owner and manager Don Zhu. Sherman stated,

> I know our agreement is for full rent to commence in December—we are still clawing our way back up—we have 68 kids active in the building and we had 52k in income last month. We need 110 kids in the building to cover full rent. . . .
>
> Is there any[ ]way we can do three more months—we are adding a kid or two every week—so we can absolutely pay a little more maybe 13 in December—15 in January—17 in February—full rent by March.
>
> I certainly appreciate any support you can offer—we also have our lawsuit against our business interruption insurance as they denied every claim—TLE [the franchisor of the daycare] helped us file a class lawsuit— if we get that you will get every penny immediately and first.

Zhu responded, "As long as you can repay the additional differences the same way we agreed on before, we can do what you requested, i.e., 'three more months, 13 in December—15 in January—17 in February—full rent by March.' Can you prepare and execute an addendum?"

5

Tenant further moved for summary judgment on its rent abatement claim. As evidence, Tenant relied on Sherman's declaration. Sherman stated that while repairs were underway after the winter storm event, the business had use of only 30 percent of the leased premises through May 2021, about 50 percent in June and July 2021, and about 90 percent from August through October 2021; that enrollment was thus "drastically limited by the sheer lack of space"; and that Tenant nevertheless paid 100 percent of rent during that time.

Landlord filed a response asserting among other arguments that it had not agreed to the Sixth Amendment. Attached to Landlord's response was a declaration by Zhu stating that no Sixth Amendment had ever been signed. Landlord also included an October 2021 email from Sherman in which she forwarded to Zhu their previous emails about extending the Fifth Amendment. Sherman told Zhu, "Here is the email I sent and you responded to—again I apologize that it was not signed—I didn't follow up like I should have. I can have [Tenant] do that now and date it for 11/19/20?"

The trial court granted partial summary judgment for Tenant. The order dismissed Landlord's claims, found Landlord liable on Tenant's rent abatement claim, and ordered that judgment would be rendered against Landlord for damages and attorney's fees "following [Tenant's] submission of evidence."

## III. Motion to Enter and Trial Court's Final Judgment

Following the trial court's grant of partial summary judgment, Tenant amended its pleading to drop all claims except the claims for rent abatement and attorney's fees.

6

On the same day, Tenant filed a "Motion for Entry of Final Judgment" supported with declarations regarding attorney's fees and damages. Landlord then filed a jury demand.[1]

The hearing on Tenant's motion was set for December 15, 2022, four days before the previously scheduled December 19 trial setting. Landlord filed objections to the motion, and Tenant filed a reply in which it characterized the motion as "its Motion for Entry of Final Judgment ('<u>Final SJ Motion</u>')." [Emphasis in original.] After a hearing, the trial court signed a final judgment awarding Tenant $89,827.61 in damages, $146,513 in attorney's fees, and $6,716 in costs.

## Standard of Review

We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential

---

[1] Section 19.5 of the Lease states, "19.5 Jury Trial. Tenant and Landlord both waive a trial by jury of any or all issues arising in any action or proceeding between the parties hereto or their successors, under or connected with this Lease, or any of its provisions."

elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant is entitled to summary judgment on a plaintiff's cause of action if the defendant conclusively negates at least one essential element of the plaintiff's claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

## Discussion

### I. Landlord's Breach of Lease Claim

In its first issue, Landlord argues that the trial court erred in granting Tenant's motion for partial summary judgment on Landlord's breach of lease claim. Under this issue, Landlord argues that the trial court erred by determining that the parties' email exchange constituted a valid amendment to the Lease.

Landlord does not dispute that an email may constitute an enforceable agreement if it otherwise meets the requirements for a contract. Among other requirements, a contract must address all of its essential terms with "a reasonable degree of certainty and definiteness." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481 (Tex. 2019) (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016)). Essential terms "are those that the parties would consider 'vitally important ingredients' to their agreement and are determined on a case-by-case basis." *Id.* (quoting *Fischer*, 479 S.W.3d at 237).

"[W]hen contracting parties leave an essential term open for future negotiation[,] . . . no binding contract exists," but a contract is not unenforceable merely because the

8

parties left nonessential terms open for future agreement. *Musallam v. Ali*, No. 02-16-00282-CV, 2019 WL 1950179, at *7–8 (Tex. App.—Fort Worth May 2, 2019, no pet.) (mem. op.) (citing *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). Thus, an email may constitute an enforceable contract even if it anticipates some future agreement or future memorialization of the parties' agreement. *See Fischer*, 479 S.W.3d at 238; *Shirvani v. Celebrity Healthcare Mgmt., LLC*, No. 05-19-00192-CV, 2020 WL 1887894, at *5 (Tex. App.—Dallas Apr. 16, 2020, pet. denied) (mem. op.) (holding email constituted an agreement). Further, if a term appears to be uncertain, part performance under the agreement may remove the uncertainty "and establish that a contract enforceable as a bargain has been formed." *Fischer*, 479 S.W.3d at 240.

In this case, the parties had executed a Fifth Amendment to the Lease that set out all the essential terms for that amendment. *See City of Houston v. Williams*, 353 S.W.3d 128, 138–39 (Tex. 2011) (stating that essential terms include, among other things, the time of performance, the price to be paid, and the service to be rendered); *Medic Pharmacy, LLC v. AVK Props., LLC*, No. 01-21-00447-CV, 2022 WL 2347923, at *5 (Tex. App.—Houston [1st Dist.] June 30, 2022, no pet.) (mem. op.) (noting that lease at issue set out its material terms, "i.e., identification of the parties, description of the leased premises, the [l]ease term, and the parties' obligations thereunder"). Under the Fifth Amendment, the parties agreed that for April and May 2020, Tenant could defer paying its monthly rent—$22,917—and that each month from June 2020 to November 2020, Tenant could pay $11,980 each month and defer payment of the rest

9

of the rent amount. Beginning in December 2020, when Tenant was supposed to resume paying the full rent amount, it also would begin paying the deferred rent, amortized over 72 months. As we will explain, the parties could and did extend the Fifth Amendment by exchanging emails expressing their agreement to that extension.

In her November 2020 email, Sherman acknowledged that the parties had an agreement that was due to end in December, but she asked if they could "do three more months"—that is, extend the agreement through February. However, she offered to pay more during those three months than Tenant had paid under the Fifth Amendment. Zhu, Landlord's representative, stated that Landlord "can do what you requested i.e., 'three more months, 13 in December—15 in January—17 in February—full rent by March,'" so long as Tenant "can repay the additional differences the same way [that the parties had] agreed on before." Landlord's statement that it wanted Tenant to "repay the additional differences the same way" was a reference to the terms of the Fifth Amendment that the Tenant was asking to extend. In other words, Tenant asked to extend the parties' existing agreement for three months but decrease the amount deferred, and Landlord agreed. The Fifth Amendment set out the essential terms of the parties' agreement to temporarily amend the Lease to defer part of the monthly rent and create an obligation for Tenant to repay the deferred rent, and the November 2020 emails showed an agreement to extend those terms through February 2021.

At the end of Landlord's email, Zhu added, "Can you prepare and execute an addendum?" Landlord argues that this was an invocation of the Lease's Section 19.15,

10

which states, "Modifications to Lease. Any modification or change in this Lease shall not be valid or binding unless in writing and signed and delivered by both parties." Landlord argues that the term "delivered by both parties" in that section "should mean that each party 'shall' deliver the agreed upon, signed[,] and written amendment." The case cited by Landlord for that proposition addresses the delivery of materials for use in a public work for purposes of the Texas Government Code, not delivery of a document. *See Bond Restoration, Inc. v. Ready Cable, Inc.*, 462 S.W.3d 597, 600–01, 602 (Tex. App.—Amarillo 2015, pet. denied) (discussing Tex. Gov't Code Ann. §§ 2253.001, .024). Further, Landlord does not explain how the emails in this case do not constitute a writing, were not signed,[2] and were not delivered to the other party. *See* Tex. R. App. P. 38.1(i); *Shirvani*, 2020 WL 1887894, at *5; *see also* Tex. Bus. & Com. Code Ann. §§ 322.005–.015 (authorizing writings and signatures to be in electronic form and to be sent and received electronically); *Dittman v. Cerone*, No. 13-11-00196-CV, 2013 WL 5970356, at *4–5 (Tex. App.—Corpus Christi–Edinburg Oct. 31, 2013, no pet.) (mem. op. on reh'g) (holding that emails constituted enforceable contract despite containing language about a future document). *Cf. Occidental Petroleum Corp. v. Wells Fargo*

---

[2]Tenant's brief invites us to reconsider our holdings in *Cunningham v. Zurich American Ins. Co.*, 352 S.W.3d 519, 530 (Tex. App.—Fort Worth 2011, pet. denied), in which we addressed whether a series of emails could be considered signed for purposes of creating a Rule 11 agreement. We agree with Landlord that we need not reconsider *Cunningham* in this case; this case does not involve a Rule 11 agreement, and Landlord has not argued that the emails were not signed.

*Bank, N.A.*, 622 F. Supp. 3d 495, 516 (S.D. Tex. 2022) (mem. op. & order) (holding emails evidenced a binding agreement); *Wal-Mart Stores Tex. LLC v. Shirey*, No. 14-18-00545-CV, 2020 WL 548323, at \*4 (Tex. App.—Houston [14th Dist.] Feb. 4, 2020, pet. denied) (mem. op.) (holding that series of emails constituted enforceable settlement agreement); *Crews v. Dkasi Corp.*, 469 S.W.3d 194, 200 (Tex. App.—Dallas 2015, pet. denied) (considering emails in determining whether parties had enforceable Rule 11 agreement).

Landlord contends that Section 19.15 "contemplates that there must be a signed, written agreement delivered between the parties *subsequent to* the email exchange." We disagree. Although Section 19.15 contains a writing requirement, it does not prohibit electronic communications from satisfying that requirement.

Landlord further contends that its email "shows that [Zhu] expected the parties to sign a final document documenting the email exchange." Zhu may have had that expectation, but that expectation does not make the execution of a separate document an essential term. As stated, the emails constituted an agreement to extend the Fifth Amendment as modified; the Fifth Amendment set out the material terms, and the emails that the parties later exchanged extended it by three months and decreased the deferred amount. Thus, all the material terms of the Sixth Amendment were put in writing by the parties. The circumstances and the language used by Landlord do not support a conclusion that a future memorialization was essential to the agreement. *See Shirvani*, 2020 WL 1887894, at \*5 (noting that party's email contemplated a future

12

memorialization of the parties' agreement but stating that "the intention to execute future documentation does not preclude the email from being an enforceable contract"). As noted above, Landlord provided no explanation for why the emails could not be considered a writing, signed, or delivered. *See id.*; *cf.* Tex. Bus. & Com. Code Ann. § 322.015 (explaining when an electronic record is considered sent or received).

Landlord further argues that the parties' email exchange "does not satisfy the requirements of *Chalker Energy Partners, III LLC v LE Norman Operating, LLC,* 595 S.W.[3d] 668 (Tex. 2020)[,] and *Copano Energy, LLC v Bujnoch*, 593 S.W.[3d] 721 (Tex. 2019)," cases in which the Texas Supreme Court addressed whether emails could constitute a valid agreement. These cases are distinguishable.

The email exchange in *Chalker* had been preceded by a confidentiality agreement between the parties that contained a no-obligation clause stating that the parties had no agreement "until a definitive agreement has been executed and delivered" and that "the term 'definitive agreement' does not include an executed letter of intent or any other preliminary written agreement or offer, unless specifically so designated in writing and executed by both Parties." 595 S.W.3d at 670. The Texas Supreme Court stated that by including the no-obligation clause in the confidentiality agreement, the parties "agreed that a definitive agreement was a condition precedent to contract formation." *Id.* at 673. The court then reviewed the parties' email exchange and concluded that the emails were "more akin to a preliminary agreement than a definitive agreement . . . , and the parties' dealings suggest that they intended that a more formalized document . . . would satisfy

13

the definitive-agreement requirement." *Id.* at 675. The court noted that the parties still had "key agreements to be negotiated . . . before a definitive agreement would exist," including an escrow agreement, a noncompete agreement, and a joint operating agreement. *Id.*

In this case, however, if there were essential terms still left for the parties to negotiate, we do not know what they were. The emails themselves do not indicate that there was anything more for the parties to negotiate.

In *Copano*, the Texas Supreme Court held that some of the emails on which the plaintiffs relied were missing essential terms and that the other emails on which they relied to show those missing essential terms were "nothing more than a request to negotiate at a later meeting." 593 S.W.3d at 728–29. Those problems do not exist in this case, for the reasons that we have explained.

Landlord additionally states in one sentence that Tenant "focused solely on that part of the email that dealt with deferring the rent for the three months from November 2020 through January 2021," which was "an improper interpretation because the email exchange, to be valid," contained as an essential element a term requiring the rent to be paid from Tenant's class action lawsuit. Landlord's brief contains no further argument related to this sentence in Tenant's email. *See* Tex. R. App. P. 38.1(i). To the extent that Landlord contends that the emails did not constitute a Sixth Amendment because the parties needed a separate writing memorializing an agreement that Tenant would pay any class-action-lawsuit proceeds to Landlord, we disagree. Landlord agreed in its email

14

to "do what [Tenant] requested, i.e., 'three more months'" of the reduced rent, repaid "the *same way* [that the parties] agreed on before" in the Fifth Amendment. [Emphasis added.]

Landlord next argues that it established that "there was no mutual assent for the email exchange to be a valid Sixth Amendment to the [L]ease." However, Landlord does not explain how it established no mutual assent. *See* Tex. R. App. P. 38.1(i.). Assuming its argument is based on its earlier arguments, we reject this part of its first issue for the same reason we rejected its previous arguments.

Finally, Landlord contends that because "there was no signed lease amendment that complied with Section 19.15 of the [L]ease," we must accept as true Zhu's affidavit attached to Landlord's summary judgment motion in which he stated that Tenant was in default on its rent. Because we have held that the parties did have an agreement to amend the Lease, we overrule the remainder of Landlord's first issue.[3]

## II. Landlord's Liability for Rent Abatement Damages

In Landlord's second issue, it argues that the trial court erred by granting partial summary judgment on Landlord's liability on the Tenant's rent abatement claim. We agree.

---

[3]In its reply brief, Landlord argues for the first time that the Sixth Amendment lacked consideration. Tenant mentioned consideration in its appellee's brief, but only when noting that in the trial court, Landlord had argued that the Fifth Amendment was invalid for lack of consideration. Because Landlord did not raise this issue in its opening brief, we will not consider it. *See* Tex. R. App. P. 38.3.

Under the Lease, after a casualty event and before completion of repairs, if Tenant was precluded from conducting its business on the premises, "the entire Base Rent and Additional Rent shall abate. If as a result of the foregoing Tenant is only partially precluded from conducting its business, such Base Rent and Additional Rent shall be proportionately abated." Landlord agrees that the Lease entitled Tenant to rent abatement "if the leased premises [wa]s damaged by a casualty and [Tenant wa]s precluded from using the lease[d] premises." Further, we do not read Landlord's brief as disputing that the leased premises experienced water intrusion after the winter storm event or that the water caused some damage to the premises. However, Landlord argues that Tenant's evidence was insufficient to show that any water damage caused part of the premises to be unusable so as to preclude Tenant from using it to conduct business. Because the evidence relied on by Tenant was conclusory, we agree with Landlord.

Tenant relied on Sherman's declaration, which was attached to the motion for partial summary judgment. That declaration stated:

12. On February 16, 2021, just as the business was starting to turn around and enrollment was increasing, [Tenant], like most parts of Texas, was hit with a devastating winter storm that caused a massive power outage. Numerous pipes at the Premises burst causing over 100,000 gallons of water to flood the classrooms and other areas at the site.

13. [Tenant] took charge to have the busted pipes repaired and fix the flooded areas. However, while the repairs were underway, from February 16, 2021 through May 2021, [Tenant] only had use of approximately 30% of the Premises. From June through July 2021, [Tenant] only had use of approximately 50% of the Premises. From August through October 2021, [Tenant] only had use of approximately

16

90% of the Premises. [Tenant] did not have full access to the Premises again until November 2021.

14. As a result, enrollment was again drastically limited by the sheer lack of space, resulting in limited revenue. However, despite the existence of a Casualty, [Landlord] did not abate Rent. Instead, [Tenant] was still paying 100% of the Rent pursuant to the Parties' agreement, despite the unambiguous terms of Section 9.2(c) of the Lease.

Sherman's declaration provided facts to show the cause of any damage to the property. However, regarding whether part of the property was unusable through October 2021, Sherman did not provide any facts from which such a conclusion could be drawn. *See Pulte Homes of Tex., L.P. v. Tex. Tealstone Resale, L.P.*, No. 02-16-00029-CV, 2017 WL 1738023, at *7 (Tex. App.—Fort Worth May 4, 2017, no pet.) (mem. op.) (explaining that a conclusory statement is one that does not provide the underlying facts to support the conclusion). Sherman did not provide any information about what kind of damage the premises suffered (e.g., damage to ceilings, drywall, or electric wiring, or mold or destroyed flooring) or which areas of the premises were affected. She did not explain in even broad terms what work had to be done or how damage to parts of the premises prevented Tenant from using those areas. The declaration provided no facts from which a conclusion could be drawn that part of the premises was unusable following the water intrusion.

Because the declaration contained no information showing the basis for Sherman's statement that only thirty percent, then fifty percent, and then ninety percent

17

of the premises was usable through October 2021, the declaration is conclusory.[4] *See Rosenberger v. LeMaster*, 678 S.W.3d 549, 569 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (reviewing nonmovant's response to no-evidence summary judgment motion attacking damages element of nonmovant's claim and stating that "[a]lthough it could be surmised from [nonmovant's] statements in his two declarations that during Hurricane Harvey, water penetrated his condominium through the roof, [nonmovant] said nothing about what damage that water may have caused"); *Brookview Partners, L.P. v. Hannah*, 260 S.W.3d 643, 646 (Tex. App.—Dallas 2008, no pet.) (holding affidavit alleging defendant's responsibility for a water leak was conclusory); *cf. State Farm Lloyds v. Hamilton*, 265 S.W.3d 725, 733 (Tex. App.—Dallas 2008, pet. dism'd) (holding that engineer's opinion that a plumbing leak had caused foundation problems was not conclusory because he sufficiently connected his observations and the data concerning the leak, the soil samples, and the foundation's movement).

---

[4]With Tenant's motion for final judgment, it attached another declaration from Sherman that contained substantially similar language regarding the winter storm event. That declaration provided no more information about usable space than the first declaration had. Tenant also attached to the motion a table "demonstrat[ing] the amount of abatement that [Landlord] should have applied monthly following the February 2021 Casualty Event." The table had columns for the months from April 2020 to November 2021; the base rent that Tenant contended was due for that month; the lease amendment that applied to that month, if any; the percentage of the premises that Tenant claimed was usable for that month; and the amount of rent abatement that Tenant claimed to be owed for that month. The table did not provide any information about the bases for the percentages.

Tenant also attached to its summary judgment motion an email to Zhu in which Sherman and her husband, Tenant's other co-owner, stated, "As we are all well aware, we have suffered and continue to suffer at least 45% closure of our school (only able to occupy 55% of the premises) by reason of the Casualty, **while still paying the Landlord 100% of the rent** over all these many months since March 1, 2021—which is clearly in direct violation of our lease agreement rights." [Emphasis in original.] Like Sherman's declaration, the email provides no facts to support the conclusion about how much—or if any—of the premises was unusable.

Because none of Tenant's summary judgment evidence established as a matter of law Landlord's liability on Tenant's rent abatement claim, the trial court erred by granting summary judgment as to liability. We sustain Landlord's second issue. Because the trial court's final judgment on Tenant's rent abatement claim was premised on its prior summary judgment ruling, we reverse the part of the trial court's final judgment that disposes of Tenant's rent abatement claim and remand the claim to the trial court. Because we have sustained Landlord's second issue on the basis that Sherman's declaration is conclusory, we need not address Landlord's other argument under this issue that Sherman's declaration failed to comply with Texas Rule of Evidence 1006. *See* Tex. R. Evid. 1006.

### III. Landlord's Remaining Issues

Landlord argues in its third issue that the trial court erred by trying the case on December 15, 2022, instead of trying it by jury on the original trial setting four days

later. In Landlord's fourth issue, it argues that the trial court erred by finding Landlord liable for rent abatement damages in the final judgment. Because of our disposition of Landlord's second issue, we do not address these issues. *See* Tex. R. App. P. 47.1.

In its reply brief, Landlord raises an argument about a check for $89,827.61—the amount of Tenant's claimed rent abatement damages—that Landlord tendered to Tenant during the trial court proceedings. Landlord argues that it is entitled to a refund from Tenant because Tenant did not present sufficient evidence to prove its damages. However, because we do not reach Landlord's issue challenging Tenant's proof of damages, we likewise do not address Landlord's related argument that it is entitled to a refund.

In Landlord's fifth and final issue, it argues that the trial court abused its discretion by awarding legal fees to Tenant. Because our disposition of Landlord's second issue results in reversal of the trial court's judgment on the rent abatement claim, we also reverse the part of the judgment awarding attorney's fees to Tenant. *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 432 S.W.3d 381, 398 (Tex. App.—San Antonio 2014, pet. denied).

## Conclusion

Having overruled Landlord's first issue, we affirm the trial court's judgment as to Landlord's claims against Tenant. Having sustained Landlord's second issue, we reverse the trial court's judgment as to Tenant's rent abatement claim and the award of Tenant's attorney's fees. We remand this case to the trial court for further proceedings.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: April 25, 2024